UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*FILED ELECTRONICALLY*

KASHIYA NWANGUMA, ET AL.

     PLAINTIFFS,

v.                                       CASE NO.  3:16-CV-247-DJH

DONALD J. TRUMP, ET AL.

     DEFENDANTS

**PLAINTIFFS' RESPONSE TO DEFENDANTS' DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, AND DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION UNDER 28 U.S.C. § 1292(b) TO CERTIFY THIS COURT'S ORDER FOR INTERLOCUTORY APPEAL AND STAY FURTHER PROCEEDINGS OR, IN THE ALTERNATIVE, RECONSIDERATION**

## 1.  STANDARD OF REVIEW

The Trump Defendants correctly identify the three relevant factors from 28 U.S.C. 1292(b) for certification of an interlocutory appeal, i.e., whether "(1) the order involves a controlling question of law, (2) a substantial ground for difference of opinion exists regarding the correctness of the decision, and (3) an appeal may materially advance the ultimate termination of the litigation." *In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002). The decision as to whether to certify a non-final opinion as appealable is within the sound discretion of the trial court. *Swint v. Chambers County Com'n*, 514 U.S. 35, 46 (1995). In fact, even where statutory criteria for interlocutory appeal are met, district court retains discretion to deny permission for such appeal. *Kuzinski v. Schering Corp.*, 614 F.Supp.2d 247, 249 (D. Conn. 2009). "As a threshold matter, interlocutory appeals in the federal system are generally disfavored." *U.S. ex rel. Elliott v. Brickman Grp. Ltd., LLC*, 845 F. Supp.2d 858, 863 (S.D. Ohio 2012). "Review under § 1292(b) is granted sparingly and only in exceptional cases." *Id.*

A Motion to Reconsider, on the other hand, "is not an opportunity to re-argue a case." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998). The party seeking reconsideration cannot simply seek a second bite of the apple, and it bears "[t]he burden of demonstrating the existence of a manifest error of fact or law." *Doe v. Patton*, 381 F.Supp.2d 595, 605 (E.D. Ky. 2005) *aff'd sub nom. Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962 (6th Cir. 2006). The Trump Defendants have not identified a manifest error of fact or law, and this Motion should be summarily denied.

## 2.  THIS CASE IS UNSUITABLE FOR APPELLATE REVIEW AT THIS TIME.

### a.  Intent to incite is a fact question.

Defendants acknowledge "*Brandenburg*'s clear command that intent is a requisite element for incitement claims." DN #36-1, Defendants' Memorandum in Support of Motion to Certify this Court's Order for Interlocutory Appeal and Stay Proceedings or, in the Alternative, Reconsideration, p. 13, Page ID #387. Indeed, Defendants' entire negligence argument focuses on what they call "the First Amendment rule that 'incitement' liability can be imposed only where 'the speaker *intends* that his speech will result in the use of violence or lawless action.'" *Id.* at p. 5, Page ID #379, citing *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (emphasis added). This element – intent – is what the Trump Defendants have chosen to hang their collective hat on in this case. *See, e.g.*, DN #9-1, Defendants' Memorandum in Support of Motion to Dismiss, p. 6, Page ID #55 (arguing, with no evidentiary support, that Trump directed his catchphrase, "get 'em out of here," to unidentified "professional security personnel," and not the crowd at large). Thus, the "controlling question" is not one of law at all, but of fact.

By now, it is quite well established that questions of intent are seldom properly resolved

even at the summary judgment stage, let alone on an *Iqbal/Twombly* motion. The Supreme Court has spoken about this in the specific context of First Amendment claims: "Because an official's state of mind is 'easy to allege and hard to disprove,' insubstantial claims turning on improper intent may be less amenable to summary disposition than other types of claims against government officials." *Crawford-El v. Britton*, 523 U.S. 574, 584–85 (1998).

Furthermore, Plaintiff again notes that there is little reason to provide any First Amendment protection to the "speech" at issue in this case. The threat that courts might "chill" the ability of a speaker to say "get 'em out of here" at a rally is, respectfully, not much of a threat at all. *See* DN #16, Plaintiffs' discussion of core speech *in* Plaintiffs' Response to Defendants' Motion to Dismiss, pp. 27-28, Page ID #167-68.  Professor Eugene Volokh describes this kind of speech as having "virtually no First Amendment value." Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1143 (2005). The role of intent thus plays an even more important role than usual in this Court's analysis. There is no reason to give this issue to the appellate court.

And despite having been prompted numerous times to provide *any* evidentiary basis for the assertion that Trump intended for the police or private security -- as opposed to supporters inflamed by his rhetoric -- to remove peaceful protesters, Trump has failed to do so. *See, e.g.*, DN #16 at p. 2, Page ID #142. The appellate court, no less than this Court, cannot just take defense counsel's word for it. Plaintiffs should be allowed to conduct discovery, and there is no reason to believe that the Sixth Circuit would rule any differently on this point than it has in the past. *See, e.g.*, *Crawford-El*, *supra*; *Grose v. Caruso*, 284 F. App'x 279, 284 (6th Cir. 2008) ("Whether or not Appellants possessed the requisite subjective state of mind needed to trigger a clearly established constitutional violation is . . . a fact-specific inquiry which is ill-suited for

3

appellate judicial review at this time.").

   **b.  The First Amendment is not a controlling legal question that would necessitate the outright dismissal of the Trump defendants.**

As stated above and previously, the First Amendment question comes down to a point of fact, i.e., Trump's intent. Thus, even if the incitement claim were the entirety of Plaintiffs' case, the "controlling question" would be one of fact, not law, and therefore not appropriate for the appellate court at this time. But as the Court is likely aware, incitement is not the beginning and end of Plaintiffs' case against the Trump Defendants.

The sustainability of Plaintiffs' negligence claims, no less than incitement, turns on facts obtainable through the discovery process. What did Trump know? When did he know it? Did he really mean it when he publicly advocated violence against protesters in several different contexts? Was he aware of the consequences of his comparable inflammatory rhetoric at campaign events preceding the incident in Louisville?  Under those circumstances, should he have foreseen an attack on peaceful protesters by an angry mob when he told its members to "get 'em out of here"? Etc. Defendants seek to subvert these inherently factual questions by arguing that it is "a pure legal question whether the First Amendment allows a speaker at a political rally to be held liable for "negligently," but unintentionally, uttering words that allegedly inspire audience members to engage in unlawful violence." DN #36-1 at p. 5, Page ID #379. Defendants appear to believe that if speech is an element of the misconduct, the First Amendment provides an *absolute* defense. *See Id.*

Thankfully, this is not the law. For example, in the Kentucky Supreme Court case *Horton v. Union Light, Heat & Power Co.,* 690 S.W.3d 382 (Ky. 1985), a customer service representative made a service call to the Horton's house to investigate a suspected gas leak. *Id.* at 386. He decided that the smell of gas was probably coming from outside without using any of his

4

equipment designed to detect gas, and told Mrs. Horton that she just needed to "close the damper" so that gas would not continue to enter the house. *Id.* Mrs. Horton followed the orders of the customer service representative, and two hours later, her house exploded. *Id.* This resulted in a finding not just of negligence, but gross negligence, as the court found that a reasonable jury could find that "the totality of circumstances indicated a wanton or reckless disregard for the lives [and] safety...of other persons, making punitive damages appropriate. *Id.* at 388. While the court considered the company's policies and procedures relevant to the case, it stated that "it is reasonably arguable that the negligent acts and omissions of the gas company's employees at the scene, standing alone, are sufficient to justify a finding of gross negligence and an award of punitive damages[.]" *Id.* Here, as in *Horton*, Trump told his supporters to do something stupid, and as a result, the lives and safety of people were put at risk. *Id.* at 386; *see* DN #16 at p. 2, Page ID #142. The mere fact that the customer service representative used speech did not immunize him from negligence liability; the court looked at the entire course of conduct. Similarly, the circumstances of this case are enough to meet the standard of "wanton or reckless disregard" for gross negligence and punitive damages; they are certainly enough to meet the standard for negligence.

Even if you take Trump's "speech" completely out of the mix altogether, a classic negligent security case remains. Did Trump or the campaign know that there was a substantial risk of violence – as there had been before – at the rally in Louisville?[1] If they did not, should they have? And what steps would a reasonable person have taken to prevent such harm? The mere fact that Trump spoke to the crowd does not, should not, and cannot absolve him of negligence liability. No court has ever held such a thing, it is not a "controlling question of law,"

---

[1] Trump himself certainly anticipated, and apparently relished, this sort of thing. *See* DN #1-1, Complaint, pp.12-14, PageID #16-18; Kate Sommers-Dawes, *All the Times Trump has Called for Violence at his Rallies*, Mashable (Mar. 12, 2016), http://mashable.com/2016/03/12/trump-rally-incite-violence/#5gAREdVthiqU.

and there is no "substantial ground for difference of opinion" on this point.

Furthermore, the Trump Defendants would likely not be out of the case even if the Sixth Circuit dismissed all of Plaintiffs' claims against them. Defendants Bamberger and Heimbach have both filed cross-claims against the Trump Defendants (*see* DN #30 and DN #32-1) claiming, among other things, that "TRUMP DEFENDANTS urged TRUMP supporters to assist in the removal of so-called 'demonstrators' and 'protestors'" (DN #32-1 at p. 24, PageID #350), and that they "relied on TRUMP's reputation and expertise in doing the things alleged" (*Id.* at p. 25, Page ID #351). In other words, Bamberger and Heimbach argue agency or vicarious liability much in the same manner that Plaintiffs did. If the case against Heimbach and Bamberger goes forward - and it will - it is hard to imagine that the Trump Defendants would not remain involved in the case in some manner. Trump himself, at the very least, is a fact witness.

Given that all the above claims exist independently of incitement, granting Defendants' request for an interlocutory appeal on discrete First Amendment grounds would not "materially advance the ultimate termination of the litigation."

### c. Trump is not immune from discovery.

As discussed in Plaintiffs' original Response (DN #16 at p. 4, Page ID #144), the contested issues of fact inherent in this case entitle them to conduct discovery (at least) before appellate review is proper. The Trump Defendants cite *Clinton v. Jones*, but it is not clear why. DN #36-1 at pp. 4, 6-7, 13-14, Page ID #378, 380-81, 387-88, citing *Clinton v. Jones*, 520 U.S. 681 (1997). That case does not help them. Defendants acknowledge that "the Court in *Clinton* did not recognize a temporary immunity for the President from civil suit," but nonetheless claim the *Clinton* court "strongly cautioned that 'the public interest demands that [the President] devote his undivided time and attention to his public duties.'" DN #36-1 at p. 7, Page ID #381, citing

*Clinton*, 520 U.S. at 697. This does not mean that an interlocutory appeal should lie, and there is not a reason to grant one simply because the Defendant now happens to be the President. As Defendants note, the questions in *Clinton* merited "respectful and deliberate consideration." DN #36-1 at p. 6, Page ID #380, citing *Clinton*, 520 U.S. at 690. Those questions – namely whether "the Constitution requires federal courts to defer such litigation until his term ends and that, in any event, respect for the office warrants such a stay" – already received due consideration in the Supreme Court's opinion itself, and were answered in the negative. *Id.* at 684. An appellate court is in no position to "reconsider" the Supreme Court's binding decision on this issue.

Furthermore, as a practical matter, the Trump presidency is, shall we say, qualitatively different from most modern presidencies in terms of the "undivided time and attention" paid by the President to his "public duties." As of this writing, Trump has played golf 20 times since his inauguration.[2] He has the time for a deposition.

### 3. THE COURT WAS CORRECT IN ITS FIRST AMENDMENT ANALYSIS.

The primary focus in the Trump Defendants' Motion to Reconsider is whether the First Amendment provides him an absolute defense to all of Plaintiffs' claims. DN #36-1 at p. 1, Page ID #375. This Court has already correctly ruled that it does not. DN #27, Memorandum Opinion and Order, p. 8, Page ID #275. Just as there is no reason to certify the decision as appealable (because "a substantial ground for difference of opinion" does not exist "regarding the correctness of the decision," *In re City of Memphis*, *supra*), there is no reason to change that decision. Specifics of Defendants' arguments are discussed further below.

#### a. The "free association implications" of this case are an *ad hoc* invention of the Trump Defendants.

Defendants assert that "political campaigns have a core First Amendment right to

---

[2]*Donald Trump Visited the Golf Course for the 20th Time as President*, Golf News Net (May 6, 2017), https://thegolfnewsnet.com/golfnewsnetteam/2017/05/06/donald-trump-visited-golf-20th-time-president-104872/.

associate for the purpose of expressing a particular message, which necessarily includes the right to 'exclu[de] . . . views [that] [a]re at odds with positions [the campaign] espouse[s].'" DN #36-1 at pp. 7-8, Page ID #381-82, citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 580 (1995). Therefore, "when a campaign has 'decided to exclude a message it d[oes] not like' from a campaign rally, 'that is enough to invoke [the campaign's] right as a private speaker to shape its expression' by excluding or expelling demonstrators who express contrary viewpoints." DN #36-1 at p. 8, Page ID #382, citing *Hurley*, 515 U.S. at 574. In other words, the First Amendment somehow allows a political campaign to violently exclude protesters from public events because there is a danger that the protesters might infringe upon the campaign's free association rights by "shaping the expression" of the entire campaign. This is absolute nonsense, and there is no support for this argument in any caselaw anywhere. Defendants seem to recognize the inherent weakness of this argument. They acknowledge that "protestors have their own First Amendment right to express dissenting views," but then reach the incomprehensible conclusion that "they have no right to do so as part of the campaign rally of the political candidates they oppose." DN #36-1 at p. 8, PageID #382.

Actually, yes they do. Defendants' argument is such a gross perversion of basic free-speech principles that the temptation to simply refer to an eighth-grade civics textbook is great. Protest is an American tradition. It's why the First Amendment *exists*. No protection is needed for speech with which everyone agrees. It is the petitioner, the dissenter, the protester whom the First Amendment protects. "The acceptance of non-violent...political protest is an expression of a true American political genius." Bruce Ledewitz, *Civil Disobedience, Injunctions, and the First Amendment*, 19 Hofstra L. Rev. 67, 80 (1990). "By channeling...protest..., Americans have brought the energy and ideas of those extremely dissatisfied with the status quo into the political

process." *Id.* Assuming purely for the sake of argument that a campaign event itself has "association" rights, where exactly would the so-called "right to exclude" begin and end? If a Trump supporter differed with him on, say, free trade, would it infringe upon the campaign's "right to associate" if he said so at a Trump rally? And what of debates? Those are "campaign events." Can one side, citing its "right to associate," exclude the other side's supporters for booing a candidate they oppose? Of course not. This is an incitement case, not a free association case.

Not only does this argument represent a frightening departure for First Amendment principles, it runs directly contrary to the rule of *Bible Believers v. Wayne County,* 805 F.3d 228 (6th Cir. 2015) – a case which Defendants have apparently read and which has been cited by both sides. *See* DN #36-1 at pp. 2, 3, 4, 5, 6, 9, 10, 11, Page ID #376, 77, 78, 79, 80, 83, 84, 85; DN #9-1 at p. 8, Page ID #57; DN #16 at p. 10, Page ID #150. As discussed in Plaintiffs' original Response, the First Amendment views the free speech of *protesters* as paramount. ("If the speaker, at his or her own risk, chooses to continue exercising the constitutional right to freedom of speech [before a hostile audience], he or she may do so without fear of retribution by the state, for the speaker is not the one threatening to breach the peace or break the law." *Id.*, citing *Bible Believers*, 805 F.3d at 253.) There is no "free association" right that would allow Defendants to violently eject peaceful protesters from a presidential campaign rally by *any* means – not in *Bible Believers*, and not in any First Amendment case.

Defendants' entire argument on this point appears to rest on the notion that a campaign rally that is open to the public should be treated the same as a parade under the First Amendment. They cite *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,* 515 U.S. 557, 572–73 (1995), as an analog. In that case, an LGBT organization sought to participate in –

not protest – a privately organized parade. The difference between protest and participation is obvious, and is well-recognized by First Amendment jurisprudence. In Sixth Circuit case *Lowery v. Jefferson County Bd. of Educ.*, 586 F.3d 427 (6th Cir. 2009), the court found the school board's policy preventing those who sought to participate in and interfere with productive meetings to be proper while the court acknowledged that regulatory powers over protest are limited in areas used for public assembly. *Id.* at 433, 32. Supreme Court case *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), held that a student could protest by wearing a black armband as it did not "materially and substantially interfere with the...operation of the school." *Id.* at 509. No one entertained the idea that Mary Beth Tinker was speaking *for the school*. *Id.* Like *Tinker* and unlike *Lowery*, Plaintiffs in the present case were protesting without participating in the operations of the campaign event - no one at the event though, or could have thought, Plaintiffs were anything other than protesters. *Hurley*, therefore, is irrelevant to the issues before the Court.

Undaunted, Defendants even go so far as to say "the Plaintiffs obviously interfered with the Trump campaign's First Amendment right to "choose the contents of [its] own message[.]" DN #36-1 at p. 8, Page ID #382, citing *Hurley*, 515 U.S. at 573. As this Court has stated (albeit in a different context), "[t]hese arguments are not those of serious people." *Love v. Beshear*, 989 F. Supp.2d 536, 548 (W.D. Ky. 2014). Campaign events to determine who will be the leader of the free world, especially those open to the general public, are qualitatively different from parades. The Plaintiff-protesters did not try to rent a booth at the Trump rally. The Plaintiffs did not do anything to make it look as though Trump sponsored their speech. To the contrary, the whole point of protesting is to contrast the view of the protester with the thing being protested. No reasonable comparison may be made between this case and *Hurley*, or any other First

Amendment case (with the exception of the incitement cases, and the Court has already analyzed those). Trump's argument, like his conduct at his rallies (which continue even now), has one purpose: suppression of dissent. That argument cannot be reconciled with a healthy American democracy in general, or the First Amendment in particular.

> **b. The mere fact that someone attempts to mitigate the harm they caused does not provide an absolute defense to tort (or any other kind of) liability.**

The Trump Defendants continue to insist that Trump absolved himself from liability *after* his initial incitement. Defendants argue: "This speech is even more protected because Mr. Trump expressly discouraged the crowd from causing any harm to the Plaintiffs." DN #36-1 at p. 5, Page ID #379. This argument is akin to shouting "Fire!" in a crowded theater, then claiming immunity because you urged the panicked crowd to file out in an orderly fashion. Defendants cite no support for the proposition that saying, "Wait, I was only kidding," after a speaker has incited violence makes the initial incitement "even more protected." That's because there isn't any such support. At best, this is an argument for mitigation of damages, albeit a weak one. And the Court should note what is implicit in Trump's argument: that he *did* in fact believe he had control of the crowd's actions. *See Id.*

But this time, in a new twist, Defendants argue it is "not remotely plausible that saying 'Don't hurt them' somehow implicitly encouraged audience members to hurt anyone." *Id.* at p. 9, Page ID #383. That's not the gravamen of Plaintiffs' Complaint, and Defendants know it. In any event, Defendants' repackaging of their old argument provides no legitimate basis for this Court to reconsider its decision.

## 4. CONCLUSION

There is no reason to certify this case for appellate review, and no reason to reconsider the Court's well-drafted Opinion. The Trump Defendants' Motions should be denied.

Respectfully submitted,


s/ *Daniel J. Canon*
DANIEL J. CANON, PSC
DAVID N. WARD
CLAY DANIEL WALTON & ADAMS, PLC
101 Meidinger Tower
462 South Fourth Street
Louisville, Kentucky 40202
(502) 561-2005
dan@justiceky.com
david@justiceky.com
*Counsel for Plaintiffs*

GREGORY A. BELZLEY
CAMILLE BATHURST
BELZLEY BATHURST ATTORNEYS
P.O. Box 278
Prospect, Kentucky 40059
(502) 228-5084
gbelzley@aol.com
*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I certify that on May 10, 2017, the above was electronically filed with the Clerk of the Court by using the CM/ECF filing system and copied to all registered CM/ECF participants in the above-styled action.

s/ *Daniel J. Canon*
DANIEL J. CANON, PSC