## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| KASHIYA NWANGUMA, et al., | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| v. | )   CASE NO. 3:16-cv-247-DJH |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| DEFENDANTS. | ) |

### REPLY IN SUPPORT OF DEFENDANTS DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, AND DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION UNDER 28 U.S.C. § 1292(b) TO CERTIFY THIS COURT'S ORDER FOR INTERLOCUTORY APPEAL AND STAY FURTHER PROCEEDINGS OR, IN THE ALTERNATIVE, RECONSIDERATION

In their motion, the Trump Defendants explained that they seek interlocutory appeal on two purely legal questions: (1) whether the First Amendment protects Mr. Trump's campaign speech as a matter of law because his call for the removal of disruptive protestors from his campaign rally was core expressive activity that did not remotely encourage unlawful violence; and (2) whether the First Amendment allows a campaign speaker to be held liable for "negligently" inspiring third parties to engage in unlawful violence. In response, Plaintiffs distort Defendants' motion by pretending that it raises the distinct *factual* issues of whether Mr. Trump "intended" to incite violence, Opposition 2-4, and whether his speech was "negligent." Opposition 4-6. But of course, the Defendants are emphatically *not* seeking review of those factual questions. Indeed, the entire point of Defendants' motion is that those issues are legally irrelevant because Mr. Trump's campaign speech cannot be deemed "incitement" as a matter of law under the First Amendment, and because "negligence" is not a permissible legal standard

under binding Supreme Court precedent. Those are both pure questions of law that control this case, and there is more than a substantial ground to conclude that the Trump Defendants are correct on both points. Plaintiffs' arguments to the contrary are badly confused.

**I.      DEFENDANTS SEEK REVIEW OF TWO PURE "QUESTIONS OF LAW"**

**A.      It Is A Pure Question of Law Whether Mr. Trump's Campaign Speech Objectively Encouraged Unlawful Violence**

Plaintiffs' primary argument is that the First Amendment's protection of Mr. Trump's campaign speech turns on the factual issue of whether he had the requisite "intent" to commit incitement. *See* Opposition 2-4. That is simply incorrect. In fact, Defendants have made clear that they do not seek interlocutory review on the factual issue of intent, but instead on the threshold legal issue of whether Mr. Trump's campaign speech objectively advocated unlawful violence. *See* Memorandum in Support at 6.

Under the First Amendment, speech cannot be punished as "incitement" unless it includes some "advocacy of the use of force or of law violation [that] is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). While "intent" is certainly one element that plaintiffs would ultimately have to prove in order to prevail, it is not at issue in the present motion. Instead, the Trump Defendants here seek interlocutory review on the threshold question of whether the speech at issue "advoca[tes] the use of force or of law violation." *Id.* This is a purely legal question that turns on the objective meaning of the words at issue. Thus, for example, in *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015), the Sixth Circuit held that the speech was not actionable "as a matter of law" because it did not "advocate for,

encourage, condone, or even embrace imminent violence or lawlessness." *Id*. at 242, 244. The same is true here.

Whether speech objectively advocates violence and thus falls outside the protection of the First Amendment is a threshold legal question. Courts do not defer to fact-finders to determine the meaning of speech for First Amendment purposes, but, in both "incitement" cases and other contexts, must "examine for [them]selves the statements in issue and the circumstances under which they were made to see . . . whether they are [protected under] the First Amendment." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 n.50 (1982) (quoting *Pennekamp v. State of Fla.*, 328 U.S. 331 (1946)). Courts "must make an independent examination . . . so as to assure [them]selves that the [plaintiff's claim] does not constitute a forbidden intrusion on the field of free expression." *Id*. (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)) (citation omitted). The "duty" of a court "is not limited to the elaboration of constitutional principles," but extends to "mak[ing] certain that those principles [are] constitutionally applied." *Id*. (quoting *Speiser v. Randall*, 357 U.S. 513, 525 (1958)). Thus, even in cases of "ambiguous speech" that arguably could be interpreted as either fully protected or as an "incitement to violence," "the Constitution enjoins upon [courts] the duty, however difficult, of distinguishing between the two." *Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952).

The threshold issue of First Amendment protection cannot be left to the vagaries of a jury trial. That is particularly true "[i]n a case such as this," where "a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of . . . vehement, caustic, and sometimes unpleasant expression." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510 (1984)) (alterations omitted). Indeed, even on a fact-intensive issue such as intent,

the importance of judicial gatekeeping is such that "[t]here will rarely be enough evidence to create a jury question on whether a speaker was intending to incite imminent crime." *Bible Believers*, 805 F.3d at 246 (citation omitted). A fortiori, there is *never* a "jury question" on the threshold *legal* issue of whether a statement contains any encouragement of violence.

Under the *Brandenburg* test, courts routinely determine as a matter of law whether speech meets the threshold condition of advocating unlawful violence. Thus, for example, in *Hess v. Indiana*, 414 U.S. 105, 107-09 (1973), the court determined as a matter of law that a speaker who yelled "We'll take the fucking street again," was not "advocating" unlawful violence despite a trial court's finding to the contrary. So too in *Claiborne*, the court again determined that saying "we're gonna break your damn neck" "did not exceed the bounds of protected speech" as a matter of law. 458 U.S. at 902, 929. As these and many other cases demonstrate, courts "must exercise independent judgment as to the legal issue of whether [a defendant's] speech and association [are] protected" against incitement liability. *McCoy v. Stewart*, 282 F.3d 626, 629 (9th Cir. 2002). Other examples abound in other First Amendment contexts as well. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 20 (1971) (holding as a matter of law that speech did not constitute actionable "fighting words"); *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 13 (1970) (holding that, "as a matter of constitutional law," the speech at issue "was not slander when spoken, and not libel when reported"); *Watts v. United States*, 394 U.S. 705, 708 (1969) (holding as a matter of law that speech was not a "threat" but rather "political hyperbole").

Plaintiffs do not even attempt to dispute this point, and thus they implicitly concede that the threshold issue of actionability under the First Amendment presents a purely legal question. Accordingly, if an interlocutory appeal is granted, the Trump Defendants will argue to the Sixth

Circuit that Mr. Trump's speech cannot constitute "incitement" as a matter of law because, even accepting Plaintiffs' factual allegations as true, he said nothing to advocate or encourage violence. He was instead exercising his core First Amendment right to call for the lawful removal of disruptive protestors from his campaign rally. Whatever the merits of that argument may be, it presents a purely legal issue under the First Amendment.

### B. It Is A Purely Legal Question Whether the First Amendment Allows A Political Candidate to Be Held Liable For "Negligent" Campaign Speech

Plaintiffs likewise claim that the "negligence" issue raised by the Trump Defendants "turns on facts obtainable through the discovery process." Opposition 4. Once again, however, they are mistaken. As Defendants made clear in their motion, they are not raising any factual issues pertaining to whether they were negligent in their speech, but are instead seeking review of the pure *legal* question of whether negligence is a *permissible* legal standard. *See* Memorandum in Support at 5 (arguing that "the correct legal standard to be applied under the First Amendment is a quintessential question of law"). It is beyond dispute that "[d]etermination of the proper standard . . . is purely a question of law." *Hatch v. Durocher Dock & Dredge, Inc.*, 33 F.3d 545, 547 (6th Cir. 1994).

Plaintiffs contend that their "negligence" claim turns on the fact-intensive issue of "negligent security," including "what steps [a] reasonable person [would] have taken to prevent [the alleged] harm." Opposition at 5. But this Court has already rejected that characterization, explaining that Plaintiffs' claim is "*not* that security officers weren't present or sufficient in number," and noting that "the complaint lacks allegations as to the type or costs of security present or needed at the rally." D. Ct. Op. at 16 (emphasis added). Instead, Plaintiffs' claim is that Mr. Trump's *speech* negligently "triggered the criminal act[s] of a third party" by inspiring

one or more audience members to commit a violent assault. D. Ct. Op. at 15. That claim sounds in incitement, and it is thus subject to the strict First Amendment standard of *Brandenburg*.

Indeed, this Court has already ruled that the *Brandenburg* rule controls here. See D. Ct. Op. at 7-8. Consequently, the fact that "negligence" is the appropriate standard for negligent commercial activity, or even negligent commercial speech, *Horton v. Union Light, Heat & Power Co.*, 690 S.W. 3d 382 (Ky. 1985), has no bearing on the political campaign speech at issue here. Contrary to Plaintiffs' mischaracterization, the Trump Defendants do not argue that "[t]he mere fact that [they] used speech" makes negligence an improper standard. Opposition at 5. Instead, they argue that Plaintiffs' own legal theory—that Mr. Trump's speech incited, inspired, or otherwise caused third parties to engage in unlawful violence—brings the case under the controlling rule of *Brandenburg*, which is specifically designed to address precisely this type of allegation, and which prohibits the imposition of liability under a mere "negligence" standard.

## II. BOTH QUESTIONS OF LAW ARE "CONTROLLING"

The Trump Defendants explained in their motion that both First Amendment issues presented here are "controlling" because "resolution of the issue[s] on appeal could materially affect the outcome of litigation in the district court," (Mem. in Supp, at 6-9 (quoting *Rafoth v. Nat'l Union Fire Ins. Co. (In re Baker & Getty Fin. Servs., Inc.)*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992)), and because "interlocutory reversal" on either issue "might save time for the district court, and time and expense for the litigants" (*id.* (quoting 16 Wright & Miller, Fed. Prac. & Proc. § 3930, at 426 (3d ed. 1996)). Plaintiffs raise two arguments in an attempt to show that the threshold First Amendment issues here are not "controlling," but both fail.

**A.** Plaintiffs contend that the First Amendment arguments raised by the Trump Defendants are not "controlling" because they will not "necessitate the outright dismissal of the

Trump defendants." Opposition at 4. That is both wrong and irrelevant. In fact, if the Trump Defendants prevail on their First Amendment arguments on appeal, then the claims against them will have to be fully dismissed. If negligence is an impermissible standard of liability under the First Amendment, then obviously Plaintiffs' negligence claims cannot be sustained. Likewise, if Mr. Trump's speech cannot be deemed incitement as a matter of law under *Brandenburg*, then Plaintiffs' incitement claims also must be dismissed. There is nothing left. Plaintiffs point out that Mr. Bamberger and Mr. Heimbach have filed cross-claims against Mr. Trump, Opposition 6, but those claims are plainly meritless because they are premised on the notion that Mr. Trump can be held vicariously liable for violent acts allegedly committed by third parties over whom he had no control, which this Court has already rejected. *See* Trump Defs' Motion to Dismiss Cross Claims 3-8 (D.N. 40, PageID # 394-400) (filed May 5, 2017). The cross-claims are also entirely independent of Plaintiffs' claims, and thus provide no basis for denying interlocutory review on whether the Plaintiffs have stated a valid claim against the Trump Defendants.

In any event, as Defendants have already explained, "the resolution of an issue need not necessarily terminate an action." *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990), *vacated on other grounds*, 937 F.2d 44 (1991). Instead, "all that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *Rafoth*, 954 F.2d at 1172 n.8. Thus, the "controlling" element is satisfied "if interlocutory reversal might save time for the district court, and time and expense for the litigants." 16 Wright & Miller, Fed. Prac. & Proc. § 3930, at 426 (3d ed. 1996). Plaintiffs do not and cannot dispute that this standard is easily satisfied here. It is thus not only plainly wrong but also entirely beside the point for them to argue that a successful interlocutory appeal here would not require "outright dismissal."

**B.** Plaintiffs argue that an interlocutory appeal is unwarranted because Mr. Trump is not "immune from discovery" under *Clinton v. Jones*, Opposition at 6, but the Trump Defendants do not seek interlocutory review to relitigate *Clinton*'s holding on immunity. Rather, as the Trump Defendants have explained, the President's status is relevant because the "potential burdens" on the President "are appropriate matters for the District Court to evaluate in its management of the case," and "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). This Court should accordingly give the Sixth Circuit the chance to review the threshold legal issues now, before imposing a needless discovery burden on the office of the President.[1] Plaintiffs suggest that dismissal of the claims against Mr. Trump will not make a difference because he will remain a "fact witness." But first, plaintiffs could not possibly justify calling the sitting President to testify as a "fact witness" when hundreds or thousands of other people at the rally were equally or better positioned to witness the alleged incident. And regardless, the burden of being called as a fact witness does not even begin to compare to the burden of being named as a defendant.

---

[1] *See also, e.g., Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 385 (2004) (emphasizing "the burden imposed by the discovery orders"); *Nixon v. Fitzgerald*, 457 U.S. 731, 789 (1982) (explaining that the President is "an easily identifiable target for suits for civil damages," and that "this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve."); *id.* at 763 (Burger, C.J., concurring) ("The need to defend damages suits would have the serious effect of diverting the attention of a President from his executive duties since defending a lawsuit today—even a lawsuit ultimately found to be frivolous—often requires significant expenditures of time and money.").

## III. PLAINTIFFS' FIRST AMENDMENT ARGUMENTS ARE MERITLESS

In their motion, Defendants explained that there is at the very least a "substantial question" whether the First Amendment protects Mr. Trump's campaign speech against Plaintiffs' claims as a matter of law. When Mr. Trump called for Plaintiffs to be removed from his campaign rally, he was not "inciting a riot" but was instead exercising his core First Amendment right to shape his campaign message by excluding disruptive protestors who were wielding signs bearing highly offensive and derogatory anti-Trump messages. Like any other private assembly, political campaigns have a core First Amendment right to associate for the purpose of expressing a particular message, which necessarily includes the right to "exclu[de] . . . views [that] [a]re at odds with positions [the campaign] espouse[s]." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 580 (1995). In exercising that core First Amendment right, Mr. Trump did not say anything to encourage anyone to engage in unlawful violence, and thus his speech cannot be subject to punitive litigation and the threat of liability.

### A. Plaintiffs' Claims Infringe on the Trump Defendants' Right of Expressive Association

Plaintiffs contend that the Trump Defendants' asserted right of free association under the First Amendment is "absolute nonsense," and that *Hurley* does not apply here because "a campaign rally" should not "be treated the same as a parade under the First Amendment." Opposition at 8-9. But far from being "absolute nonsense," the Trump Defendants' argument is dictated by controlling precedent. The Sixth Circuit has squarely held that "[a] public rally is speech to the same extent that a parade is speech." *Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996). In *Sistrunk*, the court recognized that the George H.W. Bush campaign had a core First Amendment right to exclude protestors from expressing pro-Clinton campaign

messages in a Bush campaign rally. The court explained, "[j]ust as the organizers of the parade [in *Hurley*] could not be compelled to include in their message the discordant message," so too "the rally for George Bush could not be compelled to include in its message an expression of confidence in Clinton." *Id*. Indeed, "[t]o require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally." *Id*. That holding applies with even greater force here, where Plaintiffs were admittedly disrupting the Trump rally by waving signs with his "face on the body of a pig." Compl. ¶ 44.

The Sixth Circuit also made clear that it is irrelevant whether protestors have lawfully "obtain[ed] admission tickets," because the campaign retains the ongoing right to exclude ticketholders who become disruptive at any time. *Sistrunk*, 99 F.3d at 196. As the court explained, "requir[ing] the committee to admit all ticket-holding members of the public seeking to express a message would . . . 'violate[] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.'" *Id*. at 200 (quoting *Hurley*, 515 U.S. at 573). Indeed, this principle applies even to organized events held in public spaces, because when "the government . . . grant[s] permits for speakers to use public lands," "the speakers have First Amendment rights to exclude others whose messages are conflicting or inconsistent." *Parks v. Finan*, 385 F.3d 694, 705 (6th Cir. 2004). This principle too applies with even greater force here, as the Trump rally was conducted not in an open park or on the streets, but inside a facility that Plaintiffs admit was rented for exclusive use as a ticketed campaign event. Compl. ¶ 29.

Plaintiffs' bizarre conception of the First Amendment would destroy the practical ability of political campaigns to express their own messages at campaign rallies without being sabotaged by hostile protestors. For example, Plaintiffs' theory would apparently allow legions of anti-Hillary Clinton protestors to descend on her campaign rallies holding up signs of her "face on the body of a pig," or worse, and she could do nothing to stop it—indeed, if she so much as uttered "get them out of here," she could be subject to all the burdens of litigation, discovery, depositions, and possible liability for engaging in "incitement." This reflects a fundamentally confused and backward view of the First Amendment's place in our nation's system of ordered liberty, which respects the prerogative of private organizations to shape and express their own political messages at their own private political events—including by expelling protestors who interfere with the organization's communication of its message.

### B. Mr. Trump's Campaign Speech Did Not Advocate Violence

Plaintiffs do not and cannot dispute that the First Amendment fully protects Mr. Trump's campaign speech as a matter of law unless the speech contained some "advocacy of the use of force or of law violation." *Brandenburg*, 395 U.S. at 447. The question is not whether Mr. Trump's speech *might* have advocated violence, or whether "it is plausible" that he advocated violence. D. Ct. Op. at 8. The question is whether he *did* advocate violence, which the court must decide at the threshold as a matter of law. The First Amendment does not allow the imposition of civil or criminal penalties on speech that *might* not be fully protected, leaving this basic constitutional question to a jury's "fact-finding." If the "[a]dvocacy for the use of force or lawless behavior" is "absent" from the speech at issue, then the speech is fully protected under *Brandenburg*, period. *Bible Believers*, 805 F.3d at 244.

In applying the *Brandenburg* standard, the Supreme Court has found speech to be protected as matter of law even though it far more "plausibly" could be viewed as incitement than Mr. Trump's campaign speech here. In one case, for example, "a speaker explicitly proposed to a large crowd that anyone who failed to abide by the terms of an agreed upon boycott would have to be 'disciplined.'" *Bible Believers*, 805 F.3d at 245 (quoting *Claiborne Hardware Co.*, 458 U.S. at 902). "Nonetheless, this speech was not deemed by the court to be incitement." *Id*. Indeed, even when the speaker said "we're gonna break your damn neck," which easily could have been understood to encourage violence, he "did not exceed the bounds of protected speech." *Claiborne Hardware*, 458 U.S. at 902, 929.

Likewise in *Hess v. Indiana*, "the Supreme Court held that a protestor who yelled, 'We'll take the fucking street again,' amidst an agitated crowd that was already resisting police authority could not be punished for his speech." *Bible Believers*, 805 F.3d at 244-45 (citing 414 U.S. at 107). *Hess* thus overturned as legally erroneous the trial court's finding that Hess' statement was incitement, (*id.* at 108), even though, as the dissent pointed out, there were "surely possible constructions of the statement which would encompass more or less immediate and continuing action against the harassed police." 414 U.S. at 111 (1973) (Rehnquist, J., dissenting). Those "possible constructions" of the speech and the trial court's factual findings were not enough to strip it of First Amendment protection.

As these cases illustrate, "[t]he normal method of deterring unlawful [violence] is to impose an appropriate punishment on the person who engages in it," not by shifting the blame to a non-violent speaker. *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). The category of "incitement" is a very narrow exception to the general rule. Thus, where a speaker does not

"specifically advocate" violence, the narrow exception does not apply and the speech cannot be punished. *Bible Believers*, 805 F.3d at 245.

To be sure, it is possible to imagine speech that advocates violence in an unprotected way, even if it does not do so "explicitly," but that is true only of speech that *necessarily* implies advocacy of violence, not if it only "plausibly" does so. *Bible Believers* does not alter this basic rule. Interpreting *Bible Believers* to strip away First Amendment protection for speech whenever it plausibly *could be* interpreted as an "implicit" call for violence would be at odds with its clear command that "the mere tendency of speech to encourage unlawful acts is not a sufficient reason" to render it unprotected. 805 F.3d at 244-45 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002)). It would also be at odds with *Bible Believers*' interpretation of Supreme Court precedent, discussed above, which found speech protected as a matter of law even though it far *more directly* encouraged violence then the speech here. While *Bible Believers* at one point referenced "implicitly" advocating violence (a word that appears nowhere in *Bradenburg* itself), the opinion simultaneously made it clear that it was not seeking to alter or weaken the demanding *Bradenburg* standard. In a footnote at the end of the "implicitly" sentence, the court emphasized that the proper *Bradenburg* test is whether the speech "*objectively encouraged* and urged and provoked imminent action." *Id.* at 246 n.11 (emphasis in original).

The Court did not need to, and properly did not, decide whether "implicit" statements could "objectively urge" violence, because the speech at issue there did not encourage violence either explicitly *or* implicitly. Since the challenged "words must, *at minimum*, implicitly encourage" violence, *id.* (emphasis added), the words at issue there were protected, negating any need to determine whether "implicit" encouragement can constitute "objective" encouragement. Thus, the discussion of "implicitly" inciting violence was mere dicta. Moreover, the better

explanation for why the Sixth Circuit discussed the issue of implicit incitement is that it was relevant to the qualified-immunity issue in the case. The Court needed to resolve the issue of whether the defendant police officers could be entitled to qualified immunity based on a "reasonable" belief that the speech at issue was not constitutionally protected. *See id.* at 257-58. If the speech had implicitly encouraged violence, that may have supported a qualified-immunity defense for the officers on the ground that they may have reasonably believed that the speech was unlawful incitement.

In all events, any contrary reading of *Bible Believers* would not only conflict with the portions of the opinion cited above, but with other Sixth Circuit and Supreme Court precedent. That precedent holds that state law generally cannot "regulate[] speech based upon its *implication*," because doing so will inevitably "reach[] more speech than [is] unprotected" under the First Amendment. *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 494 (6th Cir. 1995). If a statement does not *necessarily* imply the advocacy of violence, then it cannot be penalized without imperiling an enormous amount of speech that deserves full protection—i.e., speech that does not actually advocate violence, but could *plausibly* be interpreted to do so *implicitly*. That danger is especially acute in the context of "a public address—which predominantly contain[s] highly charged political rhetoric lying at the core of the First Amendment"—and which thus requires courts to "approach th[e] suggested basis of liability with extreme care." *Claiborne Hardware*, 458 U.S. at 926–27. In a speech at a campaign rally, of all places, unless the speaker engages in some clear and unambiguous act of incitement, "[t]he First Amendment requires [courts] to err on the side of protecting political speech." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 457 (2007).

Finally, as Defendants have explained, any claim of incitement here is particularly far-fetched because Mr. Trump expressly *discouraged* violence: In their complaint, Plaintiffs admit that while Mr. Trump was speaking, "[o]n or around the time the injuries occurred to the Plaintiffs . . . [he] also stated: 'Don't hurt 'em.'" Compl. ¶ 34. Plaintiffs now try to portray this as an insufficient attempt at "mitigation," claiming that it "is akin to shouting 'Fire!' in a crowded theater, then claiming immunity because you urged the panicked crowd to file out in an orderly fashion." Opposition 11. That analogy is inapt, however, because it wrongly assumes that Mr. Trump's initial call for the removal of protestors was somehow unlawful. As explained, that assumption is mistaken because Mr. Trump was exercising his First Amendment right to exclude disruptive protestors, not encouraging anyone to engage in unlawful violence. Accordingly, even if Mr. Trump had *not* said "don't hurt 'em," his speech still would have been fully protected by the First Amendment. The fact that Mr. Trump added "Don't hurt 'em" simply reinforces the point and makes this an even easier case. As the Supreme Court has said many times, the First Amendment requires statements to be "[t]aken in context." *See Watts*, 394 U.S. at 708. The fact that Mr. Trump said "don't hurt" the protestors "on or around" the time they were allegedly injured is an overwhelmingly strong contextual indication that his speech was not a call to violence. No reasonable observer could conclude that a political campaign speaker who simply exercises his First Amendment right to call for the removal of disruptive protestors and then instructs the crowd *not* to hurt them was somehow "inciting a riot."

## CONCLUSION

The Court should stay further proceedings and certify an interlocutory appeal on the two questions presented in the Trump Defendants' motion. In the alternative, the Court should reconsider its order and grant the Trump Defendants' Motion to Dismiss in its entirety.

Dated:   May 23, 2017

Respectfully submitted,

　/s R. Kent Westberry　　　　　
R. Kent Westberry
LANDRUM & SHOUSE, LLP
220 W. Main St., Ste. 1900
Louisville, KY 40202-1395
Tel: (502) 589-7616
Fax: (502) 589-2119
Email: kwestberry@landrumshouse.com

and

Michael Carvin (*admitted hac motion vice*)
Anthony Dick (*admitted hac motion vice*)
Andrew Bentz (*admitted hac motion vice*)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-7643
Fax: (202) 626-1700
Email: macarvin@jonesday.com

*Counsel for Donald J. Trump, President of the United States,
and Donald J. Trump for President Inc.*