IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| KASHIYA NWANGUMA, et al., ) | |
| ) | |
| PLAINTIFFS, ) | |
| ) | |
| v. ) | CASE NO. 3:16-cv-247-DJH |
| ) | |
| DONALD J. TRUMP, et al., ) | |
| ) | |
| DEFENDANTS. ) | |

**DEFENDANT DONALD J. TRUMP'S MEMORANDUM IN SUPPORT
OF HIS MOTION FOR A PROTECTIVE ORDER**

As the Supreme Court has recognized, due to "the singular importance of the President's duties," any "diversion of his energies by concern with private lawsuits . . . raise[s] unique risks to the effective functioning of government." *Clinton v. Jones*, 520 U.S. 681, 694 n.19 (1997). Accordingly, courts must "recogniz[e] the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004). In particular, a compulsory deposition of the sitting President of the United States must be treated as a measure of last resort. It cannot be justified unless all other possible grounds of resolving the case have been exhausted, and the deposition is absolutely necessary.

Plaintiffs here cannot make that showing because there are several possible grounds to dispose of this case that may render a deposition of the President entirely unnecessary. In particular, they face an extremely demanding standard under the First Amendment to show that he can be held liable for "inciting a riot" in the course of a campaign speech. That claim is subject to possible dismissal based on several objective factors that can be assessed without deposing the

President, including whether the speech at issue objectively "advocated" the use of unlawful violence, and whether it was "likely" to result in "imminent" occurrence of such violence. At the same time, the "negligence" claim against him *must* be resolved on objective grounds, including whether it was objectively reasonable under the circumstances for the President to exercise his constitutional right to call for the ejection of disruptive protestors from his campaign rally. Because those threshold issues may be resolved on a core of objective evidence that can be drawn from other sources, there is no need to authorize a premature deposition of the President now, when it is quite simple to avoid plunging into the corresponding thicket of constitutional concerns.

In the history of our nation, *Clinton v. Jones* marks the only case in which a sitting President has ever testified as a defendant in a deposition, and, notably, the President there did not file a motion for a protective order preventing a deposition. Instead, after the Supreme Court rejected the President's claim of absolute immunity from suit, it became clear that the only way to resolve the case was to resolve the core factual dispute of what exactly transpired during the private encounter between the two parties to that litigation. Accordingly, there was no way to avoid the need for the President's deposition. In the present case, by contrast, there is no such essential factual dispute because the events in question occurred in front of thousands of witnesses, and it is abundantly clear that Plaintiffs' claims may be resolved on the basis of objective inquiries that do not require the President's deposition. Under these circumstances, without any demonstrated need for the President's testimony, this Court should not become the first court ever to order a compulsory presidential deposition over the President's affirmative protest.

## BACKGROUND

Plaintiffs have two live claims against President Trump and his former political campaign (Donald J. Trump for President, Inc.): incitement and negligence. As to incitement, Plaintiffs claim that at a political rally where Plaintiffs were admittedly engaged in disruptive protests, then-candidate Trump "incited a riot" by saying "get 'em out of here." DN 1 Compl. ¶¶ 29-32, 36-65. Plaintiffs also allege that Mr. Trump's call for the expulsion for the protestors was tortuously "negligent" because it "trigger[ed] the criminal act[s] of a third party" by inspiring audience members to engage in violence. District Court Opinion, DN 27, at 15.

From the moment Plaintiffs filed their Complaint, it has been clear that their primary objective has been to use the court system and the discovery process to inflict maximum political damage on President Trump. For example, their recently filed discovery requests seek a host of clearly irrelevant information, including the President's "tax returns" and the names "of all medical providers from whom Trump has sought or received any psychological and/or psychiatric and/or mental health treatment or counseling." Presumably so that they can press for further such extraneous information, Plaintiffs have repeatedly attempted to set dates to depose President Trump. Just days after he was elected President (and while the Motion to Dismiss was still pending) Plaintiffs asked to set a deposition date. They renewed the request as soon as this Court decided the Motion to Dismiss, without waiting for any briefing on the issue. And even after this Court set a briefing schedule, Plaintiffs again, just days ago, requested "dates 60-90 days out when Mr. Trump will be made available for deposition," and "recommend[ing] that [the deposition] take place in federal court here in Kentucky." As it is clear Plaintiffs are committed to their course of embarrassing and irrelevant discovery requests (precisely the sort of requests that Federal Rule 26(c) forbids), the President now moves for a protective order.

**ARGUMENT**

I.  **DEPOSING THE SITTING PRESIDENT IS A MEASURE OF LAST RESORT THAT MUST BE RESERVED FOR "EXTRAORDINARY CIRCUMSTANCES"**

The Supreme Court has recognized that "[t]he high respect that is owed to the office of the Chief Executive … is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton*, 520 U.S. at 707. The President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Id.* at 697. Accordingly, "the separation-of-powers doctrine requires" that courts tread carefully in the course of litigation to ensure that they do not "impair" the President "in the performance of [his] constitutional duties." *Id.* at 694 n.19.

As the Supreme Court has warned, echoing President Jefferson, the executive function would be badly compromised if "the several courts" were to treat the President as nothing more than an ordinary litigant, which would allow him to be "band[ied] from pillar to post, keep him constantly trudging from north to south & east to west, and withdraw him entirely from his constitutional duties." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 n.31 (1982) (quoting Letter from T. Jefferson to G. Hay (June 20, 1807)). Chief Justice Marshall agreed, explaining that "[i]n no case … would a court be required to proceed against the president as against an ordinary individual." *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807). In particular, the Supreme Court has explained that it would raise serious separation-of-powers concerns if the judiciary were to attempt to force the sitting President to testify. *See United States v. Nixon*, 418 U.S. 683, 691 (1974). Indeed, such an "extraordinary" attempt must, at the very least, "raise[] judicial eyebrows." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (opinion of O'Connor, J.).

Even when the deposition of the President *himself* is not at issue, "[t]here is wide agreement among the Circuits that current high-ranking government officials should not be subject to the taking of depositions absent extraordinary circumstances." *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 316 (D.N.J. 2009). *See, e.g.*, *In re United States (Jackson)*, 624 F.3d 1368, 1372 (11th Cir. 2010) (EPA Administrator); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (Mayor of Boston); *In re United States (Reno)*, 197 F.3d 310, 313 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (Members of the FDIC Board of Directors); *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993) (per curiam) (FDA Commissioner); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (top officials at the Department of Labor). Indeed, despite the high bar for mandamus relief, courts of appeals have routinely issued the writ to prevent such compulsory testimony absent a showing of extraordinary necessity. *See United States Bd. of Parole v. Merhige*, 487 F.2d 25, 29 (4th Cir. 1973) (members of the United States Parole Board); *In re United States (Jackson)*, 624 F.3d at 1372-73; *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam) (Vice President); *In re United States (Reno)*, 197 F.3d at 314; *In re FDIC*, 58 F.3d at 1060; *In re United States (Kessler)*, 985 F.2d at 513; *In re United States (Bernanke)*, 542 F. App'x 944, 948 (Fed. Cir. 2013) (Federal Reserve Chairman). As a result, even executive officials who are *subordinate* to the President are "rarely, if ever, compel[led]" to testify. *In re United States (Jackson)*, 624 F.3d at 1376; *see also United States v. Morgan*, 313 U.S. 409, 421-22 (1941).

Two rationales compel this rule. First, "[h]igh ranking government officials have greater duties and time constraints than other witnesses." *In re FDIC*, 58 F.3d at 1060. "[P]ublic policy requires that the time and energies of public officials be conserved for the public's business to as great an extent as may be consistent with the ends of justice in particular cases." *Community Fed.*

- 4 -

*Savs. & Loan v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983). Government officials are often targets of litigation, and "failure to place reasonable limits upon private litigants' access to responsible governmental officials as sources of routine pre-trial discovery would result in a severe disruption of the government's primary function." *Id.* Moreover, it is not only the actual deposition that threatens to distract government officials from their important work. A deponent does not merely have an obligation to attend his deposition; he must also spend time preparing for it. Preparing for a deposition is a significant burden on a witness, and can take days or even weeks. *See, e.g.*, *Hanover Ins. Co. v. Smith Bros. Ins.*, No. 12-4548, 2014 WL 6769690, at *1 (S.D.N.Y. Nov. 26, 2014) (witness spent two days preparing for deposition); *In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 383 (E.D. Pa. 2006) (witness spent over two weeks preparing for deposition).

Second, the respect for separation of powers requires courts to refrain from ordering the deposition of high-ranking government officials. *See In re United States (Jackson)*, 624 F.3d at 1373-74 ("[C]ompelling the [Food and Drug Administration] Commissioner's testimony by telephone for 30 minutes disrespected the separation of powers."). When a court orders the deposition of an executive official, it risks creating a clash between co-equal branches of government. *Nixon*, 418 U.S. at 691. Indeed, "there is a marked difference between requiring a private litigant to submit to a contempt order … and requiring executive agency officials to do so." *In re SEC ex rel. Glotzer*, 374 F.3d 184, 188 (2d Cir. 2004). Because the latter pits two branches of government against one another, it threatens to "impair" each other's functioning. *Clinton*, 520 U.S. at 694 n.19.

For these reasons, courts have universally agreed that "exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted." *In re Office of Inspector Gen., R.R. Retirement Bd.*, 933 F.2d 276, 278 (5th Cir. 1991). While this is true of all

senior executive officials, it is especially true of the President himself, who "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697.

## II. PLAINTIFFS CANNOT ESTABLISH "EXTRAORDINARY CIRCUMSTANCES" THAT JUSTIFY A COMPULSORY DEPOSITION OF THE PRESIDENT

To show the type of "extraordinary circumstances" that could justify a compulsory deposition of the sitting President, Plaintiffs must "establish at a minimum" that the President (1) "possess[es] information essential to [the] case," which is (2) "not obtainable from another source." *In re United States (Reno)*, 197 F.3d at 314. This means that the discovery sought must not only be "relevant," but actually "necessary" to resolve the case, and that the information sought "cannot otherwise be obtained." *Id.* In other words, Plaintiffs must show that the information is "*essential*," and that all other methods of discovery have been exhausted.

These requirements are a natural application of Federal Rule of Civil Procedure 26, which limits discovery to that which is "proportional to the needs of the case, considering . . . whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). When considering the unprecedented prospect of a compulsory deposition of the President, the "burden" is exponentially higher than in normal litigation and thus the potential "benefit" to the requesting party must be equally strong. Rule 26 also requires courts to "limit the frequency or extent of discovery" if the information sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(c). When the burden at issue is distracting the Chief Executive from his important duties, it is incumbent upon the requesting party to show that a deposition is essential to prove the party's claims and that the party has tried every other means available to obtain the information. *See, e.g.*,

*California v. United States*, 2006 WL 2621647, at *1 (N.D. Cal. Sept. 12, 2006) ("[I]nterrogatories are an appropriate discovery method in lieu of deposing a high ranking government official.").

Consistent with this reasoning, "[c]ourts have interpreted Rule 26(c) to impose limits on when a high-ranking government official may be subject to deposition." *Jameson v. Oakland Cty.*, 2011 WL 219555, at *1 (E.D. Mich. Jan. 24, 2011). It is clear, moreover, that the party seeking the deposition bears the burden of establishing extraordinary circumstances, even when the potential deponent is the one moving in the first instance. *In re United States (Reno)*, 197 F.3d at 314; *In re United States (Bernanke)*, 542 F. App'x at 948 ("As an initial matter, courts have held that even in cases such as this, in which the government is a movant, the party seeking deposition bears the burden of proving extraordinary circumstances.").

In the present case, Plaintiffs cannot carry their burden to justify a compulsory deposition of the President. First, they cannot show that a deposition is actually "necessary," because there are several threshold grounds on which their claims may be resolved without the need for any information that the President might possess. And second, they have not exhausted other avenues to obtain whatever relevant information they may seek, including interrogatories. Both of these failures independently confirm that the President is entitled to a protective order against a deposition that would needlessly impose a significant burden on the Executive Branch.

### A. Plaintiffs' Claims Can Be Resolved Based On Objective Inquiries Without Compelling The President to Submit to a Deposition

As Defendants have explained in their Motion for Interlocutory Appeal or Reconsideration, they believe that the claims against President Trump should be dismissed as a matter of law, which by itself should vitiate the need for any deposition. DN 36-1, at 3-12. But even assuming this Court was correct in refusing to grant President Trump's Motion to Dismiss, a deposition would still be

premature at this time because the claims against President Trump may yet be disposed of on the basis of objective inquiries that do not turn on any information the President may possess.

**Incitement.** To prevail on their incitement claim, Plaintiffs must also prove that (1) President Trump's statement encouraged the use of unlawful violence, (2) the imminent use of such violence was the likely result, and (3) President Trump intended that his speech would result in the use of violence. *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 242, 246 (6th Cir. 2015) (en banc) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). These are conjunctive elements, such that Plaintiffs' claims must be dismissed if they cannot prove any one of the three. *Id*. Thus, while President Trump may personally possess information that is relevant to the third element, i.e., his intent, that issue will be entirely irrelevant if Plaintiffs cannot satisfy the first two elements of the *Brandenburg* test.

The first two elements are objective inquiries that do not turn on anything President Trump could be asked in a deposition. On the first element, whether President Trump's speech advocated the use of unlawful violence turns on the objective meaning of the words used under the circumstances. *See Bible Believers*, 805 F.3d at 246 n.11 (dispositive First Amendment question is whether the speech at issue "*objectively* encouraged and urged and provoked imminent action" (emphasis in original)). Likewise, the second element of the *Brandenburg* test simply asks whether the speech at issue was "likely" to result in unlawful violence under the circumstances, which again is an objective inquiry that does not turn on anything President Trump might be asked in a deposition. *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 109 (1973) (per curiam) (stating that there was "no evidence, or rational inference from the import of the language, that [the] words were … likely to produce imminent disorder" (emphasis removed)). Accordingly, unless and until Plaintiffs can show that they satisfy the first two elements of the *Brandenburg* test, any deposition

of the President would be improper, because any questions that he may be asked may well turn out to be entirely irrelevant.

This Court has not yet made any such threshold determination on whether President Trump's speech objectively encouraged or was likely to result in unlawful violence. Rather, the Court has only opined that it is "plausible" that his speech did so. District Court Opinion, DN 27, at 8. While the Trump Defendants have argued that the First Amendment's protection of President Trump's speech can be determined as a matter of law based on the face of the complaint, DN 36-1, at 4-5, that is beside the point here. For purposes of this Motion, the relevant point is that this Court should independently resolve the first two objective elements of the *Brandenburg* test before allowing the President to be deposed on the potentially irrelevant issue of his subjective intent.

President Trump is highly likely to prevail on these elements because he did not utter a single word about unlawful violence: Plaintiffs admit that he said nothing more than "get 'em out of here," followed soon thereafter by "Don't hurt 'em." DN 1 Compl. ¶¶ 32, 34. Thus, far from advocating unlawful violence, President Trump was exercising his constitutional right to expel disruptive protestors from his campaign rally. *See* Mot. for Interlocutory Appeal or Reconsideration, DN 36, at 8. As both the Supreme Court and the Sixth Circuit have recognized, political campaigns and candidates have a core First Amendment right to associate for the purpose of expressing their political message, which necessarily entails the right to "exclu[de]" disruptive protestors who seek to express "views [that] [a]re at odds with positions [the candidate] espouse[s]." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 580 (1995); *see also Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996).

Here, Plaintiffs obviously interfered with President Trump's First Amendment right to "choose the content of [his] own message," *Sistrunk*, 99 F.3d at 200, when they attended a pro-

Trump campaign rally in order to display their contempt for Mr. Trump by, for example, holding "up a sign depicting [Mr.] Trump's face on the body of a pig," DN 1 Compl. ¶ 44. Once that disruption occurred, Mr. Trump had every right to call for the removal of the protestors from the event by saying "get 'em out of here." Any contrary rule would destroy the practical ability of political campaign speakers to call for the ejection of hostile protestors seeking to sabotage the speaker's message.

Moreover, Kentucky law recognizes that it is entirely lawful to "use that degree of force" that is "reasonably necessary under the circumstances to eject an unwelcome trespasser." *McCoy v. Taylor Tire Co.*, 254 S.W.2d 923, 924 (Ky. 1953). Accordingly, even if President Trump had advocated the use of force, which he emphatically did not, his call for the removal of Plaintiffs in this case was fully protected under the First Amendment unless he advocated (and created a likelihood of) a greater degree of force than was necessary to remove them—once again, an entirely objective inquiry. Again, it will be practically impossible for Plaintiffs to make this showing, because they admit that President Trump said nothing other than "Get 'em out of here," followed shortly thereafter by "Don't hurt 'em." DN 1 Compl. ¶¶ 32, 34.

**Negligence.** Plaintiffs' other claim is that President Trump negligently inspired violence when he called for Plaintiffs to be ejected from his campaign rally by saying "get 'em out of here." As President Trump has separately explained, *Brandenburg* plainly does not allow a campaign speaker to be held liable for "negligently" inspiring violence, but rather limits liability to cases of *intentional* incitement. *See* Mot. for Interlocutory Appeal or Reconsideration, DN 36, at 11-12. But in any event, a deposition of President Trump cannot possibly yield any evidence that is necessary to resolve Plaintiffs' negligence claim because it turns an entirely objective inquiry. To prove negligence, a plaintiff must "establish: (1) a duty on the part of the defendant; (2) a breach

of that duty; and (3) consequent injury." *Murphy v. Second St. Corp.*, 48 S.W.3d 571, 573–74 (Ky. Ct. App. 2001). The ultimate question is what a reasonable person would do under the circumstances. *Id.* It is black-letter law that negligence is an objective standard and does not turn on what was in someone's mind. *See, e.g.*, *The Germanic*, 196 U.S. 589, 596 (1905) ("The standard of conduct, whether left to the jury or laid down by the court, is an external standard, and takes no account of the personal equation of the man concerned."); *see also* RESTATEMENT (SECOND) OF TORTS § 283 (1965) *cited in Garrett v. Lancaster Agency, Inc.*, No. 2007-CA-001415-MR, 2009 WL 2901200, at *4 (Ky. Ct. App. Sept. 11, 2009).

In fact, Kentucky courts have *excluded* subjective evidence in negligence cases. *Franz v. Ashland Hosp. Corp.*, 2014 WL 813085, at *8 (Ky. Ct. App. Feb. 28, 2014). In *Franz*, a patient sued her doctor in negligence for injuries the patient suffered after surgery. In an effort to prove her claim, the patient asserted that the surgeon suffered from bipolar disorder and sought discovery related to the surgeon's mental health. The court firmly rejected that effort, stating the standard of care "is an objective one." *Id.* That standard "provides no basis for delving into a physician's mental state," because the "proper focus is whether the physician's *conduct* was within the standard of care." *Id.* It is thus "inappropriate" to ask "a jury, as part of their responsibility to determine whether the standard of care has been breached, to consider the particular psychological stressors of the physician on trial," because such an approach "would have the effect of converting an objective standard to a subjective one." *Id.* at *7.

The same rationale applies here. There is nothing to learn from President Trump regarding Plaintiffs' negligence claim that could not be found through other sources. The question is what a reasonable person would have done in the circumstances, not what President Trump's mental state

was. The proper focus is the conduct and the objective circumstances, not on anything that was inside President Trump's head.

### B. Even if the Issue of Intent Is Relevant, It Can Be Resolved Without Deposing the President

In light of the above, the only issue on which President Trump could arguably have relevant information is the issue of intent—i.e., whether he intended for his campaign speech to result in violence. As noted, that issue is entirely irrelevant under *Brandenburg* unless Plaintiffs can first show that his speech objectively advocated unlawful violence and was likely to result in the imminent occurrence of such violence. Moreover, under the Court's negligence standard (which we believe is erroneous under *Brandenburg*), liability can be imposed without any inquiry into President Trump's intent. Thus, the issue of subjective intent is likely to be irrelevant under either the Trump Defendants' or the Court's interpretation of *Brandenburg*.

But even assuming President Trump's liability will turn on the subjective issue of intent, deposing him is still unnecessary because his intent can easily be ascertained based on extrinsic evidence without deposing him. It is black-letter law that "[t]he intent with which an act was done may be proved . . . by facts and circumstances from which the existence of the intent may be reasonably inferred." *Stuart v. Hayden*, 169 U.S. 1, 9 (1898); *see also Davis v. Commonwealth*, 967 S.W.2d 574, 581 (Ky. 1998) ("[i]ntent may be inferred from the act itself and/or the circumstances surrounding it").

Courts readily apply this objective method for determining intent in cases involving incitement. For example, in *Hess*, the Court detailed the antiwar demonstration Mr. Hess was engaged in and quoted Mr. Hess as saying "We'll take the fucking street again." 414 U.S. at 107. But the Court did not require Mr. Hess's testimony to determine his mental state. Instead, the Court clearly stated that there was "no evidence, or *rational inference from the import of the language*,

that his words were intended to produce, and likely to produce, imminent disorder." *Id.* at 109 (first emphasis added and emphasis removed). Likewise in *Bible Believers*, the Sixth Circuit looked to the words and surrounding circumstances to conclude that there was no "indication that [speakers] intended imminent lawlessness to ensue." 805 F.3d at 244; *see also James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) (concluding, at the motion-to-dismiss stage, that speakers "certainly did not 'intend' to produce violent actions"); *Entm't Software Ass'n v. Granholm*, 426 F. Supp. 2d 646, 652 (E.D. Mich. 2006) (determining that "video game producers do not intend for the[ir] consumers to commit violent actions").

Moreover, even in the case where a material question of fact about intent precludes summary judgment, the jury can resolve that question without a deposition of the speaker. Consider the Fourth Circuit's decision in *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233 (4th Cir. 1997). There, relatives of two murder victims sued the publisher of a "hit man" instruction manual that, they alleged, had incited the killer. The court explained that a factfinder could infer the requisite intent from four pieces of indirect evidence: the book's "declared purpose" of facilitating crime; the book's "extensive, decided, and pointed promotion of murder"; the publisher's promotional description of the book; and the lack of a plausible "lawful purpose" for the book. *Id.* at 253–55. In other words, a direct interrogation of what was in the publisher's mind was not necessary to resolve the claim.

This rule—that intent can be determined based on a defendant's words and actions—applies even in criminal cases, where juries must find intent beyond a reasonable doubt. *Davis v. Lafler*, 658 F.3d 525, 533 (6th Cir. 2011) (en banc) (holding that circumstantial evidence was sufficient to infer intent to aid and abet a carjacking); *United States v. Ellzey*, 874 F.2d 324, 327–28 (6th Cir. 1989) (explaining that "circumstantial evidence alone is sufficient to sustain a

conviction" for conspiracy, a specific-intent crime); *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005) ("The law . . . recognizes that the mens rea elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom."). If testimony is not necessary to prove intent beyond a reasonable doubt, it is certainly not necessary to prove intent under the far less demanding preponderance standard.

These cases compel the conclusion that even on the ultimate issue of "intent," Plaintiffs can pursue other discovery avenues without any need to depose the President. This Court is perfectly capable of resolving the intent question on summary judgment, in light of the speech itself and the surrounding circumstances. When a speaker's words do not convey an intent to bring about lawless action, the inquiry into intent is over. There is nothing to ask President Trump because his words speak for themselves. His statement "Get 'em out of here" conveys no intent to cause violence; it was merely a lawful request to remove disruptive protestors from the private political event. And his statement "Don't hurt 'em" cannot possibly manifest an intent to actually "hurt" the Plaintiffs. Before this Court thrusts itself into a constitutional dilemma by considering whether a deposition of the President is necessary to Plaintiffs' claims, those claims should be put to the summary-judgment test focused on the purely objective threshold elements that they must satisfy. But even if this Court resolves those threshold issues after discovery and still concludes that there is a material question regarding intent, the jury will be perfectly capable of weighing the evidence of the facts and circumstances to infer a rational conclusion. Accordingly, the President's testimony is not essential to Plaintiffs' case even on the issue of intent.

*     *     *

The President is entitled to a protective order shielding him from any efforts by Plaintiffs to depose him in this litigation. High-ranking government officials should rarely, if ever be

compelled to testify, and that is all the more true with respect to the sitting President. Plaintiffs cannot come close to justifying a compulsory deposition of the President because they cannot show that President Trump has any information that is essential to their case, and they have not exhausted other avenues of discovery. For these reasons, this Court should issue a protective order, precluding the President's deposition.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion for a Protective Order.

Dated: July 17, 2017

Respectfully submitted,

  /s R. Kent Westberry
R. Kent Westberry
LANDRUM & SHOUSE, LLP
220 W. Main St., Ste. 1900
Louisville, KY 40202-1395
Tel: (502) 589-7616
Fax: (502) 589-2119
Email: kwestberry@landrumshouse.com

and

Michael Carvin (admitted *pro hac vice*)
Anthony Dick (admitted *pro hac vice*)
Andrew Bentz (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-7643
Fax: (202) 626-1700
Email: macarvin@jonesday.com

*Counsel for Donald J. Trump, President of the United States,
and Donald J. Trump for President Inc.*