No. _____

# In The United States Court of Appeals
## for the Sixth Circuit

**In Re Donald J. Trump,**
**and Donald J. Trump for President, Inc.,**

*Petitioners.*

U.S. District Court for the Western District of Kentucky
No. 3:16-247 (Hon. David J. Hale)

**Petition for Writ of Mandamus**

Michael Carvin
Anthony Dick
Vivek Suri
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C.  20001
(202) 879-7643
macarvin@jonesday.com

*Counsel for Petitioners*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule, 26.1, Petitioner Donald J. Trump for President, Inc. makes the following disclosure:

Donald J. Trump for President, Inc. is not a parent, subsidiary, or other affiliate of a publicly owned corporation, nor does a publicly owned corporation have any interest in Donald J. Trump for President,. Inc. No publicly owned corporation has a substantial financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................ 1

STATEMENT OF THE CASE ......................................................................... 3

    A.    Plaintiffs' Allegations .......................................................... 3

    B.    Proceedings Below ............................................................. 5

ARGUMENT .............................................................................................. 8

I.    THE DISTRICT COURT CLEARLY ERRED AS A MATTER OF LAW .......................................................................................... 10

    A.    The First Amendment Protects Mr. Trump's Right To Call for the Removal of Disruptive Protestors From His Campaign Rally ........................................................................... 10

    B.    The First Amendment Protects Mr. Trump's Speech Because It Did Not Advocate Violence ................................................ 13

    C.    Mr. Trump Cannot Be Held Liable for "Negligently" Inspiring Third Parties to Engage in Violence .................................... 23

II.    MANDAMUS IS THE ONLY ADEQUATE MEANS TO AVOID IRREPARABLE HARM .................................................................... 25

III.    MANDAMUS IS APPROPRIATE UNDER THE CIRCUMSTANCES ......................................................................... 31

CONCLUSION ........................................................................................... 33

CERTIFICATE OF COMPLIANCE

APPENDIX

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Abelesz v. OTP Bank,*
    692 F.3d 638 (7th Cir. 2012) ..............................................................9

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001)..........................................................................15

*Bible Believers v. Wayne Cty.,*
    805 F.3d 228 (6th Cir. 2015) (en banc) .....................................*passim*

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984)...........................................................................18

*Brandenburg v. Ohio,*
    395 U.S. 444 (1989) (per curiam)..............................................*passim*

*Briggs v. Ohio Elections Comm'n,*
    61 F.3d 487 (6th Cir. 1995) .........................................................20, 21

*Cheney v. U.S. Dist. Ct. for D.C.,*
    542 U.S. 367 (2004).............................................................8, 9, 27, 30

*Chesher v. Allen,*
    122 F. App'x 184 (6th Cir. 2005) (per curiam) ..................................8

*Clinton v. Jones,*
    520 U.S. 681 (1997)............................................................27, 28, 30

*Cohen v. California,*
    403 U.S. 15 (1971).............................................................................17

*Elrod v. Burns,*
    427 U.S. 347 (1976)...........................................................................27

*Ex Parte Peru*,
   318 U.S. 578 (1943)............................................................................30

*FEC v. Wis. Right to Life, Inc.*,
   551 U.S. 449 (2007)............................................................................21

*Feld v. Feld*,
   688 F.3d 779 (D.C. Cir. 2012)...........................................................22

*Greenbelt Co-op. Publ'g Ass'n v. Bresler*,
   398 U.S. 6 (1970) (per curiam)..........................................................17

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
   485 U.S. 271 (1988)............................................................................30

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952)............................................................................16

*Helstoski v. Meanor*,
   442 U.S. 500 (1979)............................................................................26

*Hess v. Indiana*,
   414 U.S. 105 (1973)......................................................................15, 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995)......................................................................10, 11

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003)............................................................................24

*In re Asbestos Sch. Litig.*,
   46 F.3d 1284 (3d Cir. 1994) ..............................................................26

*In re Bendectin Prods. Liab. Litig.*,
   749 F.2d 300 (6th Cir. 1984) ....................................................8, 9, 32

*In re Chimenti*,
   79 F.3d 534 (6th Cir. 1996) ...............................................................31

iv

*In re Kessler*,
   100 F.3d 1015 (D.C. Cir. 1997) ........................................................................29

*In re King World Prods., Inc.*,
   898 F.2d 56 (6th Cir. 1990) ..............................................................................27

*In re Lott*,
   424 F.3d 446 (6th Cir. 2005) .............................................................................25

*In re Perrigo Co.*,
   128 F.3d 430 (6th Cir. 1997) ...............................................................................8

*In re Roman Catholic Diocese of Albany*, *N.Y., Inc.*,
   745 F.3d 30 (2d Cir. 2014) (per curiam) .............................................................9

*In re United States*,
   197 F.3d 310 (8th Cir. 1999) .............................................................................29

*In re USA*,
   624 F.3d 1368 (11th Cir. 2010) .........................................................................29

*John B. v. Goetz*,
   531 F.3d 448 (6th Cir. 2008) ......................................................................10, 32

*McCoy v. Taylor Tire Co.*,
   254 S.W.2d 923 (Ky. 1953) ...............................................................................22

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ....................................................................................*passim*

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ....................................................................................22, 24

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ...........................................................................................28

*O'Leary v. Commw.*,
   441 S.W.2d 150 (Ky. 1969) ...............................................................................22

*Parks v. Finan*,
    385 F.3d 694 (6th Cir. 2004) ............................................................... 11

*Rogers v. United States*,
    422 U.S. 35 (1975) ............................................................................... 24

*Sistrunk v. City of Strongsville*,
    99 F.3d 194 (6th Cir. 1996) .................................................... 11, 12, 13

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................. 17

*United States v. Alvarez*,
    567 U.S. 709 (2012) ............................................................................. 24

*United States v. Burr*,
    25 F. Cas. 187 (C.C.D. Va. 1807) .................................................. 28, 29

*Washington Post Co. v. Keogh*,
    365 F.2d 965 (D.C. Cir. 1966) ............................................................ 26

*Watts v. United States*,
    394 U.S. 705 (1969) ............................................................................. 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................. 28

**STATUTES**

28 U.S.C. § 1291 ......................................................................................... 30

28 U.S.C. § 1292 .................................................................................. 6, 7, 30

28 U.S.C. § 1651 ........................................................................................... 8

# INTRODUCTION

Petitioners Donald J. Trump and his presidential campaign respectfully request a writ of mandamus to dismiss this vexatious lawsuit that is clearly barred by binding First Amendment precedent. Without this Court's intervention, this litigation will inflict irreparable harm on the Trump Defendants by subjecting them to punitive litigation as the price of exercising their core First Amendment rights, and by imposing intrusive discovery—which already includes Plaintiffs' requests for the President's "tax returns" and the names "of all medical providers from whom Trump has sought or received any psychological" treatment—and a potential deposition of the sitting President of the United States based on claims that are clearly meritless. Because the district court declined to dismiss the suit and has failed to either certify an interlocutory appeal on the controlling First Amendment issues or stay discovery pending such certification, mandamus is now the only remedy that can prevent the baseless infliction of this irreparable harm.

This lawsuit arises out of a Trump campaign rally held in March 2016, which Plaintiffs attended for the avowed purpose of engaging in disruptive anti-Trump protests. By their own admission, one Plaintiff "held up a sign depicting [Mr.] Trump's face on the body of a pig." Mr. Trump responded by calling for the protestors to be removed. According to the complaint, he said, "Get 'em out of here" and "Don't hurt 'em," at which point various audience members "took it

1

upon themselves" to commit an unlawful assault against the protestors. The protestors then filed suit seeking to hold Mr. Trump and the Campaign liable for "inciting a riot" and "negligently" inspiring the audience members to commit the alleged assault.

Under binding Supreme Court precedent, Plaintiffs' claims against the Trump Defendants are clearly barred by the First Amendment as a matter of law. In *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1989) (per curiam), the Supreme Court made clear that a speaker cannot be subject to liability for "incitement" unless he intentionally advocates imminent unlawful violence. But in the present case, the district court held that the claims against Mr. Trump could go forward based on his speech at a campaign rally that did not contain a single word advocating violence and was far less inflammatory than statements the Supreme Court has held to be fully protected as a matter of law. Indeed, the challenged speech was an exercise of Mr. Trump's clear First Amendment right to exclude disruptive protestors from his campaign rally. Worse still, the court also held that even if Mr. Trump did not *intentionally* advocate violence, he could still be held liable for *negligently* inspiring the audience members to assault Plaintiffs—a complete evisceration of the *Brandenburg* rule.

As a result of this clearly erroneous ruling, the district court has given a green light to Plaintiffs' calculated effort to punish Mr. Trump for exercising his

First Amendment rights, and to inflict maximum political damage on him through the process of litigation. Unless this Court intervenes now, they will succeed in using their meritless claims to hamstring the sitting President and his administration by embroiling the highest ranking Executive Branch officials in a contentious and distracting discovery fight. This Court should not allow that to happen. It should issue a writ of mandamus ordering the claims against the Trump Defendants to be dismissed.

## STATEMENT OF THE CASE

### A.   Plaintiffs' Allegations

On March 1, 2016, the Trump presidential campaign ("Donald J. Trump for President, Inc.") held a political rally at the Kentucky International Convention Center in Louisville, Kentucky. Compl. ¶ 29 (attached as Tab 2). The Campaign paid to rent the event space, and entry was restricted to ticketholders. *Id*. ¶¶ 29-31. Among the attendees were the three Plaintiffs, who came for the avowed purpose of disrupting the event by staging protests of then-candidate Donald J. Trump. *Id*. ¶¶ 36-65. For example, Plaintiff Nwanguma admits that after being admitted to the rally, while standing in the crowd, she "held up a sign depicting Defendant Trump's face on the body of a pig." *Id*. ¶ 44.

Predictably, the protests caused a significant disruption, requiring Mr. Trump to "stop[] his half-hour speech five different times" to call for the protestors

to be removed. *Id*. ¶ 32. Each time, Mr. Trump said, "Get 'em out of here" or "Get out of here." *Id*. Plaintiffs allege that, in response, various members of the audience "took it upon themselves to use physical force to remove [the protestors]." *Id*. ¶ 47. Plaintiffs also allege that "[o]n or around the time the injuries occurred to the Plaintiffs, … Trump also stated: 'Don't hurt 'em. If I say "go get em," I get in trouble with the press, the most dishonest human beings in the world.'" *Id*. ¶ 34.

According to Plaintiffs, "[t]he most aggressive" audience members were Matthew Heimbach and Alvin Bamberger. *Id*. ¶ 48. In particular, Plaintiffs allege that Heimbach "repeatedly shoved [Plaintiff] Nwanguma and shouted 'leftist scum' at her," and Bamburger "aggressively mov[ed] [her] further through the crowd by shoving her and striking her." *Id*. ¶¶ 49-50. Plaintiff Shah alleges that she "was shoved hard from behind by Defendant Heimbach" and "was shoved and pushed by multiple Trump supporters." *Id*. ¶¶ 58-59. Plaintiff Brousseau alleges that he was "punched … in the stomach" by an unknown member of the audience. *Id*. ¶ 64. As a result, Plaintiffs allege that they suffered injuries that they describe as "anxiety and nightmares," "pain," and "difficulty sleeping." *Id*. ¶¶ 60, 65.

Plaintiffs filed a tort suit alleging assault and battery against Defendants Heimbach, Bamberger, and an "Unknown Defendant." Plaintiffs also named Mr. Trump and the Campaign as defendants, asserting three separate claims: incitement, negligence, and vicarious liability for the actions of the crowd

According to Plaintiffs, Mr. Trump's call for the removal of the protestors "incited a riot as defined under the Kentucky penal code." *Id*. ¶ 103.

### B.    Proceedings Below

On May 20, 2016, the Trump Defendants filed a motion to dismiss Plaintiffs' claims against them. As relevant here, the Trump Defendants argued that Mr. Trump's campaign speech was fully protected under the First Amendment as a matter of law. His call for the removal of protestors did not fall within the narrow category of unprotected "incitement," because it did not advocate violence and was not "directed to inciting or producing imminent lawless action." *Brandenburg*, 395 U.S. at 447. The Trump Defendants also argued that the *Brandenburg* test does not allow a campaign speaker to be held liable for speech that "negligently" inspires third parties to engage in violence. Finally, the Trump Defendants argued that they could not be held "vicariously liable" for any violent acts of the audience members, because they were not agents or employees of Mr. Trump or the Campaign but were independent third parties.

The district court granted the motion to dismiss the vicarious-liability claim but denied the motion to dismiss the incitement and negligence claims. On the incitement claim, the district court concluded that Mr. Trump's speech was not protected under *Brandenburg* because it is "plausible that Trump's direction to 'get 'em out of here' advocated the use of force" and "at least implicitly encouraged the

5

use of violence or lawless action." D. Ct. Op. 8 (Tab 1). The court distinguished other cases under *Brandenburg* by noting that here, Mr. Trump's call for the removal of protestors was "stated in the imperative" as "an order, an instruction, a command." *Id.*

On negligence, the court concluded that because "Plaintiffs have adequately alleged that Trump's words amounted to incitement," "[t]heir negligence claim thus presents no First Amendment concerns at this stage of the case." *Id.* at 13. Accordingly, the court held that even if Mr. Trump did not intentionally advocate violence, he could be liable for speaking in a way that negligently "trigger[ed] the criminal act[s] of a third party," by inspiring audience members to engage in violence. *Id.* at 15.

On April 20, 2017, the Trump Defendants filed a motion for reconsideration or, in the alternative, certification of two issues for interlocutory appeal under 28 U.S.C. § 1292(b): First, whether the First Amendment protects Mr. Trump's campaign speech against "incitement" liability because he did not advocate violence; and second, whether the First Amendment allows a speaker to be held liable under a "negligence" standard for speaking in a manner that allegedly inspired third parties to violence. D.N. 36. Briefing was completed May 23.

After filing the § 1292(b) motion, the Trump Defendants moved the magistrate to stay discovery, which the magistrate denied. On May 22, the Trump Defendants elevated the stay request to the district court, which has not acted on it.

Plaintiffs then served their first discovery requests on the Trump Defendants, seeking a host of clearly irrelevant information, including the President's "tax returns" and the names "of all medical providers from whom Trump has sought or received any psychological" treatment. Plaintiffs have repeatedly attempted to set dates to depose Mr. Trump, presumably to press for further extraneous information. Just days after he was elected (and while the motion to dismiss was still pending) Plaintiffs asked to set a deposition date. They renewed the request as soon as the district court decided the motion to dismiss. And more recently, they again requested "dates 60-90 days out when Mr. Trump will be made available for deposition," and "recommend[ed]" that the deposition take place "in Kentucky."

Having not heard from the district court on the interlocutory appeal request or the request to stay discovery, the Trump Defendants made one final attempt to obviate the need for this petition. On June 26, Defendants filed a letter with the district court, requesting a decision on either the interlocutory appeal or the stay objection. D.N. 54. To date, however, the district court has still not decided the issues. As a result, the President was forced to file yet another motion in the district court on July 17 seeking a protective order against a deposition.

7

# ARGUMENT

The All Writs Act allows this Court to "issue all writs necessary or appropriate in aid of [its] jurisdictio[n]." 28 U.S.C. § 1651(a). Mandamus relief is appropriate when (1) the "right to issuance of the writ is clear and indisputable," (2) "the party seeking issuance of the writ [has] no other adequate means to attain the relief he desires," and (3) "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). "These hurdles, however demanding, are not insuperable," *id.* at 381, especially in the Sixth Circuit, which "has a more flexible approach to mandamus than other circuits," *Chesher v. Allen*, 122 F. App'x 184, 187 (6th Cir. 2005) (per curiam); *see also In re Perrigo Co.*, 128 F.3d 430, 435 (6th Cir. 1997) (mandamus is appropriate to address "questions of unusual importance necessary to the economical and efficient administration of justice").[*]

The Supreme Court has made clear that "separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President." *Cheney*, 542 U.S. at 382. Accordingly, a classic justification for "issu[ing] the writ" is "to restrain a lower court when its actions

---

[*] This Court also may grant mandamus based on two additional "guidelines," although it has "never required that every element be met": (1) the lower court's order is "an oft-repeated error, or manifests a persistent disregard of the federal rules," and (2) "raises new and important problems, or issues of law of first impression." *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 303-04 (6th Cir. 1984).

would threaten the separation of powers by embarrassing the executive." *Id*. at 381.

"Accepted mandamus standards are broad enough to ... prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities," *id*. at 382, and subjecting the President to burdensome litigation based on meritless claims clearly satisfies this standard.

Mandamus is necessary when a district court's denial of a motion to dismiss is both clearly erroneous and threatens to impose irreparable harm on a defendant without the immediate intervention of an appellate court. *See, e.g.*, *In re Roman Catholic Diocese of Albany*, *N.Y., Inc.*, 745 F.3d 30 (2d Cir. 2014) (per curiam) (granting mandamus ordering the district court to grant motion to dismiss); *Abelesz v. OTP Bank*, 692 F.3d 638, 661 (7th Cir. 2012) (same). Where "[t]he district court's order is clearly erroneous as a matter of law" and "[t]he petitioner will be damaged or prejudiced in a way not correctable on appeal," mandamus is the only "adequate" means to attain a just result. *Bendectin*, 749 F.2d at 303-04.

That is emphatically the case here. Unless this Court issues a writ of mandamus to terminate this vexatious litigation, Defendants will suffer irreparable harm to their First Amendment rights of free speech and association. Moreover, both the sitting President of the United States and other high-ranking Executive Branch officials will be forced to devote precious time and attention to this matter instead of focusing on their constitutional duties. These irreparable harms should

9

not be imposed without any appellate review, particularly as it is so abundantly clear that Plaintiffs' claims are utterly meritless as a matter of law.

## I.   THE DISTRICT COURT CLEARLY ERRED AS A MATTER OF LAW

"Most importantly," the district court's denial of the Trump Defendants' motion to dismiss is "clearly erroneous as a matter of law." *John B. v. Goetz*, 531 F.3d 448, 458 (6th Cir. 2008). The court ignored the fundamental First Amendment rule that speech cannot be punished as "incitement" unless it advocates imminent violence, and instead held that Mr. Trump could be subject to incitement liability for calling for the removal of disruptive protestors from his campaign rally by uttering the anodyne words, "Get 'em out of here," and "Don't hurt them." The court also held that even if Mr. Trump's speech did not rise to the level of incitement, he could still be held liable for "negligently" inspiring audience members to engage in assault. Both holdings eviscerate the First Amendment's protection of speech against censorious "incitement" claims.

### A.   The First Amendment Protects Mr. Trump's Right To Call for the Removal of Disruptive Protestors From His Campaign Rally

Like any other expressive association, political campaigns and candidates have a core First Amendment right to associate for the purpose of expressing their political message, which necessarily entails the right to "exclu[de]" disruptive protestors who seek to express "views [that] [a]re at odds with positions [the campaign] espouse[s]." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of*

10

*Boston*, 515 U.S. 557, 580 (1995); *see also Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996). Accordingly, when a campaign "decide[s] to exclude a message it d[oes] not like," by expelling disruptive protestors from a campaign rally, that constitutes an exercise of the Campaign's "right as a private speaker to shape its expression." *Hurley*, 515 U.S. at 574.

In *Sistrunk*, this Court specifically recognized that a George H. W. Bush campaign rally had a First Amendment right to exclude protestors who sought to express pro-Clinton campaign messages. As the Court explained, "requir[ing] the committee to admit all ticket-holding members of the public seeking to express a message would … 'violate[] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.'" 99 F.3d at 200 (quoting *Hurley*, 515 U.S. at 573). Thus, "[t]o require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally." *Id.* at 199.

Even when "the government … grant[s] permits for speakers to use public lands," "the speakers have First Amendment rights to exclude others whose messages are conflicting or inconsistent." *Parks v. Finan*, 385 F.3d 694, 705 (6th Cir. 2004). That principle applies with even greater force here, as the Trump rally

11

was conducted not in an open public park or street, but rather inside a closed and secured facility that Plaintiffs admit was rented for exclusive use as a ticketed campaign event. Compl. ¶¶ 29-31.

Here, Plaintiffs obviously interfered with the Trump Campaign's First Amendment right to "choose the content of [its] own message," *Sistrunk*, 99 F.3d at 200, when they attended a pro-Trump campaign rally in order to display their contempt for Mr. Trump by, for example, holding "up a sign depicting [Mr.] Trump's face on the body of a pig," Compl. ¶ 44. Once that disruption occurred, Mr. Trump and the Campaign had every right to call for the removal of the protestors from the event. Any contrary rule would destroy the practical ability of political campaigns to express their own messages at campaign rallies without being sabotaged by hostile protestors. Under the district court's ruling, candidates besieged by legions of hostile opponents interfering with campaign rallies cannot so much as utter "Get them out of here," without subjecting themselves to "incitement" liability and all the onerous burdens of civil discovery and depositions. The First Amendment does not permit so disabling political candidates from conveying their unfettered messages.

Accordingly, even accepting all of Plaintiffs' factual allegations as true, it is clear that Mr. Trump was not "inciting a riot" but was rather exercising a core constitutional right when he reacted to the disruptive protestors by saying,

"Get 'em out of here" and "Don't hurt 'em." Compl. ¶¶ 32-34. Under basic First Amendment principles articulated by this Court and the Supreme Court, his speech was nothing more than an "exercise [of his] free speech rights and autonomy over the content of [his] own message" at his own political campaign rally. *Sistrunk*, 99 F.3d at 200 (quoting *Hurley*, 515 U.S. at 573). By holding to the contrary, the district court wrongly transformed Mr. Trump's protected political speech into an actionable tort.

> ### B.  The First Amendment Protects Mr. Trump's Speech Because It Did Not Advocate Violence

Because Mr. Trump's call for the removal of disruptive protestors was an exercise of his core First Amendment right of expressive association, his speech is fully protected unless it goes well beyond what is appropriate to protect his right to express an undiluted message.  Since "Get them out of here" is an entirely natural and proper expression of lawful means to protect the Campaign's undiluted message and association, it cannot be penalized under the First Amendment (particularly when accompanied by the "Don't hurt 'em" admonition).  But even if this were not a campaign rally, but an ordinary social gathering devoid of expressive import, the speech could still not be constitutionally punished since it does not fall within the narrow category of unprotected "incitement." Speech is unprotected under this narrow exception only if it "advoca[tes] the use of force or of law violation," and is both "directed to inciting or producing imminent lawless

13

action" and "likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. Consequently, if the "[a]dvocacy for the use of force or lawless behavior" is "absent" from the speech at issue, then the speech is fully protected "as a matter of law." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 242, 244 (6th Cir. 2015) (en banc).

Here, Mr. Trump's speech is protected under *Brandenburg* because it was devoid of any advocacy of violence. In calling for the removal of disruptive protestors by saying "Get 'em out of here," he did not say a single word about unlawful force or violence. To the contrary, he affirmatively *discouraged* violence by telling the audience, "Don't hurt 'em." As a matter of law, a directive to expel disruptive protestors in a way that does *not* hurt them cannot somehow be converted into a directive to expel them in a way that *does* hurt them. Simply put, calling for the removal of disruptive intruders (particularly at a campaign rally) cannot be and has never been deemed "inciting a riot," particularly when accompanied by instructions to avoid hurting the intruders.

The Supreme Court has found speech fully protected even when it constitutes far greater "incitement" than Mr. Trump's campaign speech here. In one seminal case applying *Brandenburg*, for example, "a speaker explicitly proposed to a large crowd that anyone who failed to abide by the terms of an agreed upon boycott would have to be 'disciplined.'" *Bible Believers*, 805 F.3d at 245 (quoting *NAACP*

*v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982)). The speaker also said "we're gonna break your damn neck," 458 U.S. at 902, which easily could have been understood to encourage violence. But "[n]onetheless, this speech was not deemed by the [Supreme Court] to be incitement," *Bible Believers*, 805 F.3d at 245, and thus "did not exceed the bounds of protected speech." *Claiborne*, 458 U.S. at 929.

Likewise in *Hess v. Indiana*, "the Supreme Court held that a protestor who yelled, 'We'll take the fucking street again,' amidst an agitated crowd that was already resisting police authority could not be punished for his speech." *Bible Believers*, 805 F.3d at 244-45 (citing *Hess*, 414 U.S. 105, 107 (1973) (per curiam)). *Hess* thus overturned as legally erroneous the trial court's finding that the statement was incitement, 414 U.S. at 108, even though, as the dissent pointed out, there were "surely possible constructions of the statement which would encompass more or less immediate and continuing action against the harassed police," *id.* at 111 (Rehnquist, J., dissenting). Those "possible constructions" of the speech and the trial court's factual findings were not enough to strip it of First Amendment protection because there was no clear call for imminent violence.

As these cases illustrate, "[t]he normal method of deterring unlawful [violence] is to impose an appropriate punishment on the person who engages in it," not by shifting the blame to a non-violent speaker. *Bartnicki v. Vopper*, 532 U.S.

514, 529 (2001). The category of "incitement" is a very narrow exception to the general rule. Where a speaker does not "specifically advocate" violence in unequivocal terms, the speech cannot be subject to legal penalty. *Bible Believers*, 805 F.3d at 245.

Apparently recognizing that Mr. Trump's speech did not *actually* advocate violence, the district court deemed his statements unprotected merely because "it is *plausible*" that he "at least *implicitly* encouraged the use of violence or lawless action." D. Ct. Op. 8 (emphases added). This was clear error for several reasons.

**1.** First, under *Brandenburg*, the relevant legal question is not whether the challenged speech "*plausibly*" could be construed to advocate violence, but whether it *actually* did so. Courts cannot leave the issue of First Amendment protection to the vagaries of a jury trial, but instead "must make an independent examination … so as to assure [them]selves that the [plaintiff's claim] does not constitute a forbidden intrusion on the field of free expression." *Claiborne*, 458 U.S. at 915 n.50. The "duty" of a court "is not limited to the elaboration of constitutional principles," but extends to "mak[ing] certain that those principles [are] constitutionally applied." *Id*. Thus, in cases of "ambiguous speech" that could be interpreted as either fully protected or as an "incitement to violence," "the Constitution enjoins upon [courts] the duty, however difficult, of distinguishing between the two." *Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952).

16

Second, the need for judicial gatekeeping is particularly strong "[i]n a case such as this," where "a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of … vehement, caustic, and sometimes unpleasant expression." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (alterations omitted). Indeed, even on a fact-intensive issue such as intent, the importance of judicial gatekeeping is such that "there will rarely be enough evidence to create a jury question on whether a speaker was intending to incite imminent crime." *Bible Believers*, 805 F.3d at 244 (citation omitted). A fortiori, there is *never* a "jury question" on the threshold First Amendment issue of whether a statement objectively advocates unlawful violence.

The requirement of judicial gatekeeping is hardly unique to "incitement" cases, as examples abound in other First Amendment contexts as well. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 20 (1971) (holding as a matter of law that speech did not constitute actionable "fighting words"); *Greenbelt Co-op. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13 (1970) (per curiam) (holding that, "as a matter of constitutional law," the speech at issue "was not slander when spoken, and not libel when reported"); *Watts v. United States*, 394 U.S. 705, 708 (1969) (holding as a matter of law that speech was not a "threat" but rather "political hyperbole"). As these and many other cases illustrate, "[p]roviding triers of fact with a general description of the type of communication whose content is unworthy of protection

17

has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit [free] expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984).

Third, it simply makes no sense in this context to engage in discovery and trial, in order to have a jury decide the purportedly "plausible" question of whether Mr. Trump's words "advocated violence" within the meaning of *Brandenburg*. What Mr. Trump *said* is *undisputed*. There is no reason to have a trial to resolve undisputed facts, and it is wholly improper to have a jury resolve the quintessentially legal question of whether those undisputed words are unprotected under the First Amendment. While some issues might theoretically benefit from fact-finding—such as a speaker's intent—whether the words here fall within the *Brandenburg* exception for advocating violence is just as ready for adjudication *now* as it will be after a burdensome trial. That is why, as the precedent above reflects, the Supreme Court *always* resolves First Amendment issues turning on the words used for itself as a matter of law. Thus, there was no basis whatever for the district court to seek to transfer resolution of this threshold *constitutional* question to a lay jury capable only of *fact-finding*.

**2.** To be sure, it is possible to imagine speech that may advocate violence "implicitly," D. Ct. Op. 8, but such speech can be unprotected only if the implication is abundantly clear. Any other rule would allow a wide range of speech

18

to be stripped of protection based on any creative theory of how it might "plausibly" be construed as an "implicit" call for violence. That would be at odds with the clear rule that "the mere tendency of speech to encourage unlawful acts is not a sufficient reason" to render it unprotected. *Bible Believers*, 805 F.3d at 244-45. It would also flatly defy the Supreme Court's decisions in *Hess* and *Claiborne*, both of which found speech to be fully protected although they far more "plausibly" advocated violence by calling for their agitated followers to "take the fucking street again," 414 U.S. at 107, and "break your damn neck," 458 U.S. at 902. *See Bible Believers*, 805 F.3d at 244-45. If that type of graphic language cannot be stripped of protection, then surely the same must be true of Mr. Trump's far more anodyne statement, "Get 'em out of here."

While this Court's decision in *Bible Believers* at one point referenced "implicitly" advocating violence (a word that appears nowhere in *Brandenburg* itself), the opinion simultaneously made it clear that it was not seeking to alter or weaken the demanding *Brandenburg* standard. Rather, in a footnote at the end of the relevant sentence, the court emphasized that the proper *Brandenburg* test is whether the speech "*objectively encouraged* and urged and provoked imminent action." 805 F.3d at 246 n.11. The Court did not need to, and properly did not, decide if or when an "implicit" statement might "objectively" urge violence, because the speech at issue there did not encourage violence either explicitly *or*

19

implicitly. Since the challenged "words must, *at minimum*, implicitly encourage" violence, *id.* (emphasis added), and the words at issue there did not do so, they were clearly protected, thus negating any need to determine what type of "implicit" advocacy of violence might be unprotected.

Accordingly, the reference to "implicit" incitement in *Bible Believers* was mere dicta, and the court likely mentioned it only because it was relevant to the qualified-immunity issue in the case: the court needed to resolve whether the defendant police officers could be entitled to qualified immunity based on a "reasonable" belief that the speech at issue was not constitutionally protected. *See id.* at 257-58. If the speech "implicitly" encouraged violence, that may have supported a qualified-immunity defense for the officers, because they may have "reasonably" (even if erroneously) believed that the speech was unprotected. By dispelling that notion, the court did not suggest that speech *is* unprotected whenever it implicitly encourages violence, much less whenever it could "plausibly" be so interpreted.

In all events, reading *Bible Believers* to strip away protection from speech whenever it *plausibly* can be read to *implicitly* encourage violence would directly conflict with other binding precedent. As a general matter, state law cannot "regulate[] speech based upon its *implication*," because doing so will inevitably "reach[] more speech than [is] unprotected" under the First Amendment. *Briggs v.*

20

*Ohio Elections Comm'n*, 61 F.3d 487, 494 (6th Cir. 1995). Thus, at the very least, if a statement does not *clearly* imply the advocacy of violence, then it cannot be penalized without imperiling an enormous amount of speech that deserves full protection—i.e., speech that does not *actually* advocate violence, but could *plausibly* be construed to do so *implicitly*.

The danger of punishing and chilling protected speech is especially acute in the context of "a public address—which predominantly contain[s] highly charged political rhetoric lying at the core of the First Amendment"—and which thus requires courts to "approach th[e] suggested basis of liability with extreme care." *Claiborne*, 458 U.S. at 926–27. Particularly in this sensitive area, liability cannot be imposed on a statement that is merely ambiguous. If the statement does not clearly advocate violence, and could be entirely innocent political speech at the very core of the First Amendment's protection, then it cannot be punished merely because it *might be* an "implicit" call for unlawful violence. To the contrary, the First Amendment requires courts to "err on the side of protecting political speech." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007). "[I]f the freedoms of expression are to have the 'breathing space' that they 'need to survive,'" then political candidates who exercise their First Amendment rights to call for the removal of disruptive protestors cannot be subject to the punitive burdens of

litigation by having their statements converted into "implicit" acts of "incitement." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964).

**3.**      Finally, even if Mr. Trump had called for the use of force to remove protestors (which he emphatically did not), that still would not render his speech unprotected for a simple reason: As noted, Mr. Trump had a First Amendment right to call for the removal of disruptive protestors from his campaign rally, and it is a bedrock principle of law that "the right to exclude another … includes the right to use reasonable force." *Feld v. Feld*, 688 F.3d 779, 783 (D.C. Cir. 2012). That is true even if the protestors initially purchased tickets and entered the rally in a peaceful manner before becoming disruptive, because "a refusal to leave the property, though lawfully and peacefully entered in the first instance, invites the owner to eject the intruder by force." *O'Leary v. Commw.*, 441 S.W.2d 150, 157 (Ky. 1969). Under Kentucky law, as in virtually every state, it is entirely lawful to "use that degree of force" that is "reasonably necessary under the circumstances to eject an unwelcome trespasser." *McCoy v. Taylor Tire Co.*, 254 S.W.2d 923, 924 (Ky. 1953).

Accordingly, Mr. Trump's call for the removal of protestors was fully protected unless he advocated *a greater degree of force than necessary* to remove them. Absent that type of unlawful advocacy, he cannot be liable for incitement. *See Bible Believers*, 805 F.3d at 244 (state law "cannot 'proscribe advocacy of the

use of force … except where such advocacy is directed to inciting or producing imminent *lawless* action'" (quoting *Brandenburg*, 395 U.S. at 447 (emphasis added)). Contrary to the district court's reasoning, it makes no difference that Mr. Trump's speech was "stated in the imperative" as "an order, an instruction, a command." D. Ct. Op. 8. There are many orders, instructions, and commands that are perfectly lawful—including the command to expel protestors who are interfering with the expressive association rights of a political campaign. It also makes no difference whether the crowd *reacted* with unlawful violence beyond what Mr. Trump advocated, because "[t]he hostile reaction of a crowd does not transform protected speech into incitement." *Bible Believers*, 805 F.3d at 246.

By refusing to follow these basic First Amendment principles, the district court clearly erred as a matter of law.

### C.    Mr. Trump Cannot Be Held Liable for "Negligently" Inspiring Third Parties to Engage in Violence

The district court also clearly erred by holding that even if Mr. Trump's campaign speech did not rise to the level of incitement, he can nonetheless be held liable for engaging in speech that "negligently" inspired audience members to engage in violence. D. Ct. Op. 12-13. This holding eviscerates the rule established by the Supreme Court in *Brandenburg*, which unequivocally holds that speech is fully protected under the First Amendment unless the speaker has *intentionally* advocated unlawful violence. *Brandenburg*, 395 U.S. at 447; *Bible Believers*, 805

F.3d at 246. If Mr. Trump can be held liable for allegedly inspiring audience members to engage in violence under a mere *negligence* standard without any showing of intentional advocacy of violence, then *Brandenburg* is a dead letter.

The district court opined that because "Plaintiffs have adequately alleged that [Mr.] Trump's words amounted to incitement," "[t]heir negligence claim … presents no First Amendment concerns at this stage of the case." D. Ct. Op. 13. That is incorrect. Because a negligence claim does not include any of the crucial elements of the *Brandenburg* test—the affirmative "advocacy" of violence, the "intent" to cause violence, or the "likely" result of imminent violence, 395 U.S. at 447—it would allow a jury to hold Mr. Trump liable under an erroneous legal standard based on speech that is fully protected under the First Amendment.

Even outside the specific context of incitement, the Supreme Court has repeatedly held that "negligence … is [a] constitutionally insufficient" standard for imposing liability for speech. *New York Times*, 376 U.S. at 288; *e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003); *United States v. Alvarez*, 567 U.S. 709, 719 (2012) (op. of Kennedy, J.); *see also Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring) ("[W]e should be particularly wary of adopting [a negligence] standard for a statute that regulates pure speech.").

24

Notably, as the district court made clear, Plaintiffs' surviving negligence claim is "not that security officers weren't present or sufficient in number," as "the complaint lacks allegations as to the type or costs of security present or needed at the rally." D. Ct. Op. 16. Instead, Plaintiffs' claim is that Mr. Trump's *speech* negligently "triggered the criminal act[s] of a third party" by inspiring one or more audience members to commit a violent assault. *Id*. at 15. That claim sounds in incitement, and it is thus subject to the strict First Amendment standard of *Brandenburg*. By holding to the contrary, the district court committed yet another clear legal error.

## II. MANDAMUS IS THE ONLY ADEQUATE MEANS TO AVOID IRREPARABLE HARM

In light of the district court's clear error, mandamus is now the only way to attain a prompt dismissal of Plaintiffs' claims and to avoid irreparable harm that is "not correctable on appeal." *In re Lott*, 424 F.3d 446, 449 (6th Cir. 2005). Unless this Court issues the writ, the Trump Defendants will be subjected to a costly, exhaustive, and time-consuming discovery battle where Plaintiffs are actively seeking to depose and embarrass the sitting President, based on legal claims that are clearly meritless. If this case is allowed to continue, it will cause irreparable harm not only to the core First Amendment rights of the Trump Defendants, but also to the constitutional interests of the Executive Branch. The resulting litigation will require the active participation of Executive officials at the highest levels of

25

the White House and the Department of Justice, distracting them from their vital constitutional duties. The damage will then be done, and Plaintiffs will have succeeded in using this vexatious lawsuit as a tool of political sabotage. There is no reason to let that happen without any appellate review of the threshold First Amendment issues, particularly because those issues can be resolved now as a matter of law instead of on a later appeal.

1.     Imposing the burdens of litigation on a defendant for engaging in protected speech is itself a species of irreparable harm. That is because, as the Supreme Court has recognized, the First Amendment protects speakers "not only from the consequences of litigation's results but also from the burden of defending themselves" against baseless lawsuits. *Helstoski v. Meanor*, 442 U.S. 500, 508 (1979). Without "freedom from the harassment of lawsuits," speakers "will tend to become self-censors" to avoid the burdens of litigation, and such censorship is "hardly less virulent for being privately administered" through meritless tort claims. *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966).

Accordingly, "the issuance of a writ of mandamus is appropriate to prevent the harm to First Amendment rights that would occur if review of the district court's decision had to wait until a final judgment is entered." *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1286, 1295-96 (3d Cir. 1994) (Alito, J.). Otherwise, allowing Plaintiffs' meritless claims to go forward would effectively punish the Trump

Defendants by forcing them to undergo burdensome litigation, including intrusive discovery and depositions, as the price of exercising their First Amendment rights. The resulting harm could not be remedied on appeal because "even minimal interference with First Amendment freedoms causes an irreparable injury." *In re King World Prods., Inc.*, 898 F.2d 56, 59 (6th Cir. 1990) (granting mandamus to prevent lower court's burdening of First Amendment rights); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Accordingly, even if Mr. Trump were a private citizen, mandamus would be warranted solely for the purpose of avoiding irreparable harm to his First Amendment rights.

2.      Because Mr. Trump is the sitting President of the United States, this case also threatens to inflict irreparable harm on the constitutional separation of powers, thus making need for mandamus especially acute. As the Supreme Court has emphasized, "separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President." *Cheney*, 542 U.S. at 382. Where plaintiffs target the President, courts must "recognize[e] the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Id.* The President "occupies a unique office with powers and responsibilities so

27

vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton v. Jones*, 520 U.S. 681, 697 (1997). Executive authority in this country is concentrated "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring).

"[B]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits … raise[s] unique risks to the effective functioning of government." *Clinton*, 520 U.S. at 694 n.19. These risks present separation-of-powers concerns because "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Id.* at 701. As the Supreme Court has warned, echoing Thomas Jefferson, the executive function would be badly compromised if "the several courts" were to treat the President as nothing more than an ordinary litigant, which would allow him to be "band[ied] from pillar to post, keep him constantly trudging from north to south & east to west, and withdraw him entirely from his constitutional duties." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 n.31 (1982) (quoting Letter from T. Jefferson (June 20, 1807)). Chief Justice Marshall agreed, explaining that "[i]n no

case … would a court be required to proceed against the president as against an ordinary individual." *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807).

In light of these principles, mandamus has routinely been granted to ensure that litigation and discovery cannot be allowed to proceed even against subordinate Executive Branch officials in the absence of extraordinary circumstances. *See, e.g., In re USA*, 624 F.3d 1368, 1373 (11th Cir. 2010) ("[T]he compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers," and thus courts "have required a showing of special need" before allowing it.); *In re United States*, 197 F.3d 310, 313-15 (8th Cir. 1999) (in the face of litigation "against high government officials," where the underlying "legal theory [is] without merit," "the writ is the appropriate remedy"); *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1997) (emphasizing that the writ is especially appropriate to protect the President due to "the constitutional distinction between the President himself and subordinate officers in the executive branch").

Accordingly, mandamus is warranted here because allowing Plaintiffs' vexatious claims to proceed would threaten the constitutional separation of powers by imposing an undue burden on the President and the Executive Branch. Aside from the significant burden and distraction imposed on the President himself, the case would also demand the involvement of other high-ranking government

29

officials in the White House and the Department of Justice due to the vital Executive interests at stake in any discovery fight involving the President.

Especially in a case like this, which can be fully resolved based on threshold legal issues, the "delay and inconvenience of a prolonged litigation [must] be avoided by prompt termination of the proceedings in the district court" if possible. *Ex Parte Peru*, 318 U.S. 578, 587 (1943); *see also Cheney*, 542 U.S. at 382. The controlling legal issues "merit [this Court's] respectful and deliberate consideration" at the soonest available opportunity. *Clinton*, 520 U.S. at 690. Here, that requires this Court to intervene and dismiss Plaintiffs' claims now, *before* they impose irreparable harm on both the First Amendment rights of the Trump Defendants and the constitutional interests of the Executive Branch.

**3.** The Trump Defendants have effectively exhausted all other avenues of relief short of mandamus to vindicate their constitutional rights and avoid the irreparable harms threatened by the district court's erroneous decision. They cannot directly appeal because the denial of a motion to dismiss is not a "final" order under 28 U.S.C. § 1291. *See Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 275 (1988). This case also is not within the "small class" of cases that fall under the "collateral order doctrine," because the failure to dismiss Plaintiffs' claims is not "completely separate from the merits of the action." *Id.* at 276. And though seeking interlocutory appeal under 28 U.S.C. § 1292(b) is not

required before a mandamus petition, the Trump Defendants did so. *See In re Chimenti*, 79 F.3d 534, 539-40 (6th Cir. 1996). That request has gone unanswered for almost two months, confirming that as a practical matter, mandamus is the only option left.

While immediate appellate review is essential to preclude irreparable harm, there is, conversely, no reason to delay review. The dispositive First Amendment issues are perfectly suited for immediate resolution as a matter of law. Taking all of Plaintiffs' factual allegations as true, it is clear that Mr. Trump was simply exercising his constitutional right to call for the removal of disruptive protestors, not inciting violence under the narrow *Brandenburg* exception. The relevant facts and circumstances are clear from the face of the complaint, and there is no amount of discovery or fact-finding that will shed any light on whether Mr. Trump's speech is constitutionally protected. Because he did not "advoca[te] the use of force or of law violation," his speech is protected as a matter of law. *Brandenburg*, 395 U.S. at 447. Thus, there is simply no reason to delay resolution of this straightforward legal issue until after a constitutionally burdensome trial, and every reason to resolve it now.

## III.  MANDAMUS IS APPROPRIATE UNDER THE CIRCUMSTANCES

In addition to the exceptional importance of the issues presented and the irreparable harms that may result, the district court's refusal to dismiss the

complaint against the Trump Defendants also presents a "new and important problem[]" that warrants this Court's intervention. *Bendectin*, 749 F.2d at 304. In particular, the district court's decision encourages the use of vexatious litigation as a weapon of partisan warfare to harass political opponents. Not content to interfere with the Trump Defendants' exercise of their First Amendment rights by disrupting their political rally, Plaintiffs have now raised the stakes by dragging Mr. Trump into court and subjecting him to burdensome litigation and potential legal penalties for doing what any other political candidate would have done in the same situation—calling for the protestors to be removed, without even a hint of any advocacy of violence.

Plaintiffs' aggressive legal gambit must be firmly rejected. Without a swift and assertive rebuke from this Court, such politically motivated lawfare will continue to proliferate, and will become an increasingly common tool of political sabotage in future campaigns. Waiting for a final judgment will make it impossible to address this problem, because by that time Plaintiffs will have succeeded in their mission of using the legal system to burden the President and penalize the Trump Defendants for exercising their First Amendment rights. This Court should not allow that to happen. It should instead issue a writ of mandamus now to stop this pernicious tactic in its tracks and to "provide district courts with guidance on such matters in the future." *John B.*, 531 F.3d at 461.

## CONCLUSION

For the foregoing reasons, this Court should issue a writ of mandamus ordering the claims against the Trump Defendants be dismissed.

Dated:  July 20, 2017                     Respectfully submitted,


                                          By: /s/ Michael Carvin

                                          Michael Carvin
                                          Anthony Dick
                                          Vivek Suri
                                          JONES DAY
                                          51 Louisiana Ave., N.W.
                                          Washington, D.C.  20001
                                          (202) 879-7643
                                          macarvin@jonesday.com

                                          *Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 21(d)(1). It contains 7,785 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(c) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007.

# APPENDIX

## APPENDIX – TABLE OF CONTENTS

| TAB | DOCUMENT |
|-----|----------|
| 1 | **Order Granting in Part and Denying In Part Motion To Dismiss** (D. Ct. Dkt. 27) |
| 2 | **Complaint** (D. Ct. Dkt. 1) |

Tab 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KASHIYA NWANGUMA, et al.,          Plaintiffs,

v.          Civil Action No. 3:16-cv-247-DJH

DONALD J. TRUMP, et al.,          Defendants.

\*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Kashiya Nwanguma, Molly Shah, and Henry Brousseau attended a presidential campaign rally for Defendant Donald J. Trump with the intention of protesting. Plaintiffs allege that as they were protesting, Trump said, "Get 'em out of here," following which several members of the audience, including Defendants Matthew Heimbach and Alvin Bamberger, physically attacked them, forcing them to leave the rally. They allege assault and battery by Heimbach and Bamberger, as well as incitement to riot, vicarious liability, and negligence on the part of Trump and his campaign, Donald J. Trump for President, Inc. (the "Trump Defendants"). (Docket No. 1) The Trump Defendants have filed a motion to dismiss for failure to state a claim (D.N. 9), as has Bamberger (D.N. 10); Heimbach, proceeding pro se, has moved to strike certain allegations from the complaint (D.N. 11). At this early stage of the case, the Court finds most of Plaintiffs' claims to be sufficient. Accordingly, for the reasons discussed below, the Trump Defendants' and Bamberger's motions will be granted in part and denied in part, while Heimbach's motion will be denied.

I.      BACKGROUND

        The following facts are set out in the complaint and must be accepted as true for purposes

of the present motions.  *See Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012); *Brown &*

*Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 821 (6th Cir. 1953).

        On March 1, 2016, Trump held a campaign rally at the Kentucky International

Convention Center in Louisville, Kentucky.  (D.N. 1-1, PageID # 10; *see id.*, PageID # 8)

Nwanguma, Shah, and Brousseau each attended the rally for the purpose of "peacefully

protesting Trump."  (*Id.*, PageID # 11-13)  As they were protesting, Trump said, "Get 'em out of

here."  (*Id.*, PageID # 10)  Heimbach, Bamberger, and other audience members then physically

attacked Plaintiffs.  Nwanguma, who is African-American, was shoved first by Heimbach and

then by Bamberger, who also struck her.  (*Id.*, PageID # 12)  Shah was likewise shoved by

Heimbach and other audience members.  (*Id.*, PageID # 13)  Brousseau, a seventeen-year-old

high school student, was punched in the stomach by an unknown defendant believed to be a

member of the Traditionalist Worker Party, a white nationalist group Heimbach was representing

at the rally.  (*Id.*, PageID # 7-9, 12-14)  Plaintiffs allege that as they were being attacked, Trump

said, "Don't hurt 'em.  If I say 'go get 'em,' I get in trouble with the press . . . ."  (*Id.*, PageID #

10)

        In a letter to the Korean War Veterans Association, whose uniform he wore at the rally,

Bamberger described the incident as follows: "Trump kept saying 'get them out, get them out'

and people in the crowd began pushing and shoving the protestors . . . I physically pushed a

young woman down the aisle toward the exit . . . ."  (D.N. 1-1, PageID # 15 ¶ 76 (first omission

in original) (quoting letter to KWVA))  Heimbach acknowledged in a blog post that he had

"help[ed] the crowd drive out one of the women" who were protesting.  (*Id.*, PageID # 14 ¶ 70)

2

Videos recorded at the rally captured Heimbach and Bamberger's actions.  (*Id.*, PageID # 11 ¶ 46)

Plaintiffs allege assault and battery by Heimbach, Bamberger, and the Unknown Defendant, and they seek to hold the Trump Defendants vicariously liable for those torts.  (*Id.*, PageID # 18-21)  In addition, Plaintiffs accuse the Trump Defendants of incitement to riot (*id.*, PageID # 19) and negligence, gross negligence, and recklessness (*id.*, PageID # 21-22).  They seek compensatory and punitive damages.  (*Id.*, PageID # 22)

## II.   ANALYSIS

### A.   Motions to Dismiss

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Factual allegations are essential; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the Court need not accept such statements as true.  *Id.*  A complaint whose "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" does not satisfy the pleading requirements of Rule 8 and will not withstand a motion to dismiss.  *Id.* at 679.

### 1.   Trump Defendants

The Trump Defendants seek dismissal of Counts III, IV, and V of the complaint, which allege incitement, agency/vicarious liability, and negligence, gross negligence, and recklessness. (*See* D.N. 1-1, PageID # 19-22)  The Court will address each claim in turn.

3

### a.      Incitement to Riot

The Trump Defendants oppose Plaintiffs' incitement claim on several grounds.  First, they assert that it is not plausible that Trump was addressing audience members or intended for violence to ensue when he gave the direction to remove protestors.  (D.N. 9-1, PageID # 54-55) They further contend that this claim is deficient because Plaintiffs do not allege that a riot actually occurred.  (*Id.*, PageID # 55-56)  Finally, the Trump Defendants argue that Trump's statement ("get 'em out of here") is protected by the First Amendment.  (*Id.*, PageID # 56-61) None of their contentions requires dismissal at this stage of the proceedings.

### i.      Plausibility

According to the Trump Defendants, Plaintiffs' incitement claim is implausible because there is an "obvious alternative explanation" for the meaning of Trump's words, namely that he intended for professional security personnel to remove the protestors.  (D.N. 9-1, PageID # 54 (quoting *Iqbal*, 556 U.S. at 682))  With this argument, the Trump Defendants effectively seek to impose a probability standard on Plaintiffs' complaint.  (*See id.* (asserting that "'given [this] more likely explanation[n],' Plaintiffs' allegations 'do not plausibly establish' a claim for incitement" (alterations in original) (quoting *Iqbal*, 556 U.S. at 381)))  The Sixth Circuit has rejected this approach, finding it to be inconsistent with *Twombly* and *Iqbal*.  *See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("*Twombly* insists that pleadings be plausible, not probable." (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556)).  "Often, defendants' conduct has several plausible explanations.  Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."  *Id.* Simply put, the plausibility of the Trump Defendants' explanation for Trump's statement "does not render all other [explanations] implausible."  *Id.*

4

Plaintiffs allege numerous facts supporting an inference that Trump's order to "get 'em out of here" was directed at audience members.  The complaint describes multiple occasions before and after the Louisville rally when Trump allegedly made comments endorsing or encouraging violence against protestors.  (*See* D.N. 1-1, PageID # 16-17)  And Bamberger's letter, quoted in the complaint, confirms that he and others "began pushing and shoving the protestors" upon Trump's order that the protestors be removed.  (*Id.*, PageID # 15 ¶ 76)  Moreover, after audience members took matters into their own hands, Trump allegedly stated, "Don't hurt 'em.  If I say 'go get 'em,' I get in trouble with the press."  (*Id.*, PageID # 10)  Presumably, if he had intended for protestors to be escorted out by security personnel, Trump would have instructed the intervening audience members to stop what they were doing, rather than offering guidance on how to go about it.  (*See* D.N. 1-1, PageID # 16 (alleging that Trump "watched as his supporters physically removed and accosted Plaintiffs at the Rally"))  In sum, the Court finds that the Trump Defendants have not identified an "obvious alternative explanation" for Trump's statement warranting dismissal of the incitement claim.  *Iqbal*, 556 U.S. at 662.

## ii.     Occurrence of a Riot

Next, the Trump Defendants assert that the incitement claim fails because it does not allege that there actually was a riot.  (D.N. 9-1, PageID # 55-56)  Plaintiffs bring their incitement claim pursuant to Ky. Rev. Stat. §§ 525.010 and 525.040.  (D.N. 1-1, PageID # 19)  The latter provides that "[a] person is guilty of inciting to riot when he incites or urges five (5) or more persons to create or engage in a riot."[1]  § 525.040(1).  "Riot" is defined as "a public disturbance

---

[1] A plaintiff may recover for injuries suffered as a result of a defendant's violation of a criminal statute pursuant to Ky. Rev. Stat. § 446.070.  (*See* D.N. 1-1, PageID # 19 ¶ 105 (invoking § 446.070))

involving an assemblage of five (5) or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs law enforcement or other government function." § 525.010(5). The incitement statute does not require that a riot actually occur, nor do the Trump Defendants cite any case establishing such a requirement. Nevertheless, they argue that the complaint fails to allege that five or more persons were involved in Plaintiffs' mistreatment or that there was in fact "tumultuous and violent conduct" at the rally.[2] (D.N. 9-1, PageID # 56)

The word *incitement* is defined as "[t]he act or an instance of provoking, urging on, or stirring up," or, in criminal law, "[t]he act of persuading another person to commit a crime." *Black's Law Dictionary* (10th ed. 2014). Beyond this definition, *Black's* includes the following explanation:

> An inciter is one who counsels, commands or advises the commission of a crime. It will be observed that this definition is much the same as that of an accessory before the fact. What, then, is the difference between the two? It is that *in incitement the crime has not (or has not necessarily) been committed*, whereas a party cannot be an accessory in crime unless the crime has been committed. An accessory before the fact is party to consummated mischief; an inciter is guilty only of an inchoate crime.

*Id.* (emphasis added) (quoting Glanville Williams, *Criminal Law: The General Part* 612 (2d ed. 1961)). Thus, no riot need have occurred in order for Trump to be liable for inciting one.

In any event, the supposed flaws in Plaintiffs' claim are nonexistent. The complaint alleges that Trump directed "*his crowd of supporters* to 'get 'em out of here'" (D.N. 1-1, PageID # 10 (emphasis added)) and that Nwanguma was "violently assaulted by *numerous protestors*"

---

[2] The Trump Defendants also briefly assert that "Plaintiffs fail to allege that Mr. Trump intended for any tumultuous and violent conduct to occur." (D.N. 9-1, PageID # 56) Paragraph 104 of the complaint, however, alleges precisely that. (D.N. 1-1, PageID # 19) And Plaintiffs' allegations that Trump had previously condoned violence toward protestors provide the necessary factual support for Paragraph 104. (*See id.*, PageID # 16-17)

(*id.*, PageID # 11 (emphasis added)), of whom Heimbach and Bamberger were "[t]he most aggressive" (*id.*, PageID # 12).  With respect to Shah, Plaintiffs allege that "[w]hen Trump told the audience to 'get 'em out of here,' Heimbach and his group [of four to six people] rushed in and began physically assaulting the protestors" (*id.*); "[a]s Shah continued to the back of the convention center, she was shoved and pushed by multiple Trump supporters." (*Id.*, PageID # 13)  If this were not enough, Count III of Plaintiffs' complaint tracks the language of § 525.040(1), alleging that "[i]n directing his supporters to eject peaceful protestors using harmful physical force, Trump intended to create a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct created grave danger of damage or injury." (D.N. 1-1, PageID # 19 ¶ 104)  The Court therefore finds that Plaintiffs have adequately alleged incitement of five or more persons.

Likewise, to the extent an express allegation of tumult and violence is required, Paragraph 104 satisfies that requirement.  (*See id.*; D.N. 9-1, PageID # 56 ("Nowhere in their Complaint do Plaintiffs allege there was 'tumultuous and violent' conduct or '*grave* danger.'")) The Court finds sufficient factual support for this allegation in the complaint: Plaintiffs—as well as Bamberger, in his letter—describe a chaotic and violent scene in which a crowd of people turned on three individuals, and those individuals were injured as a result.  In short, Plaintiffs' incitement claim is adequately pled.

### iii.    First Amendment

Lastly, the Trump Defendants maintain that they cannot be liable for incitement because Trump's statement ("get 'em out of here") was constitutionally protected speech.  (D.N. 9-1, PageID # 56-61)  "[W]hen a speaker incites a crowd to violence, his incitement does not receive constitutional protection."  *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 245 (6th Cir. 2015)

(citing *Glasson v. City of Louisville*, 518 F.2d 899, 905 n.3 (6th Cir. 1975)).  Under the test set forth in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), speech may not be "sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech."  *Bible Believers*, 805 F.3d at 246 (footnote omitted) (citing *Brandenburg*, 395 U.S. at 447).  In other words, "speech that fails to specifically advocate for listeners to take 'any action' cannot constitute incitement."  *Id.* at 245 (quoting *Hess v. Indiana*, 414 U.S. 105, 109 (1973)); *see id.* at 246 n.11 ("*Brandenburg*'s plain language (reinforced by *Hess*) requires that the words must, at a minimum, implicitly encourage the use of force or lawlessness, or the undertaking of some violent 'act' . . . .").  Notwithstanding the Trump Defendants' insistence to the contrary, Plaintiffs have adequately alleged that Trump's statement meets these criteria.

First, it is plausible that Trump's direction to "get 'em out of here" advocated the use of force.  Unlike the statements at issue in the cases cited by the Trump Defendants, "get 'em out of here" is stated in the imperative; it was an order, an instruction, a command.  *Cf. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982) ("If we catch any of you going in any of them racist stores, we're gonna break your damn neck."); *Hess*, 414 U.S. at 107 ("We'll take the fucking street again."); *Watts v. United States*, 394 U.S. 705, 705 (1969) ("If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.").  Based on the allegations of the complaint, which the Court must accept as true, Trump's statement at least "implicitly encouraged the use of violence or lawless action."  *Bible Believers*, 805 F.3d at 246.

Second, as discussed above, Plaintiffs allege that Trump intended for his statement to result in violence (D.N. 1-1, PageID # 15 ¶¶ 81-82, # 19 ¶¶ 104, 106), and they provide facts to

support that allegation.  *See supra* Part II.A.1.a.i.  Whether he actually intended for violence to occur is beyond the scope of the Court's inquiry at the motion-to-dismiss stage.

Third, the complaint adequately alleges that Trump's statement was likely to result in violence—most obviously, by alleging that violence actually occurred as a result of the statement.  (*See, e.g.*, D.N. 1-1, PageID # 12 ¶ 56, # 15 ¶ 76)  Further, Plaintiffs allege throughout the complaint that Trump knew or should have known that his statements would result in violence (*see, e.g.*, *id.*, PageID # 15-16 ¶ 82), and they describe a prior Trump rally at which a protestor was attacked.  (*Id.*, PageID # 16 ¶ 85)  The Court finds these allegations to be sufficient.

The Trump Defendants expend significant effort arguing that Trump's words did not call for "imminent lawless action" because Plaintiffs were trespassers and thus their removal could not have been unlawful.  (*See* D.N. 9-1, PageID # 58-60; D.N. 23, PageID # 250-52)  But the complaint does not establish that Plaintiffs were trespassers, as the Trump Defendants insist; to the contrary, it alleges that tickets and entry to the rally "were not denied to people simply because they had political views which differed from Trump and/or his supporters."  (D.N. 1-1, PageID # 10)  It thus does not establish that Plaintiffs "knew . . . that they were in a place they had no right to be" as soon as they began protesting.  (D.N. 9-1, PageID # 59 (quoting *O'Leary v. Commonwealth*, 441 S.W.2d 150, 157 (Ky. 1969)))  Unlike the appellants in *O'Leary*—student protestors convicted of breaching the peace after being "physically carried down the stairs and out of the building" by campus police for refusing to leave an area the dean had told them to vacate, 441 S.W.2d at 153—Plaintiffs did not "refus[e]" to leave before they were forcibly removed.[3]  (D.N. 9-1, PageID # 59)  Rather, according to the complaint, the violence began as

---

[3] The Court does not agree that *O'Leary* provides the applicable standard here in any event.

soon as Trump said "get 'em out of here."  (*See, e.g.*, D.N. 1-1, PageID # 12 ¶ 56; *id.*, PageID #

15 ¶ 76)  In sum, Plaintiffs have alleged a plausible claim of incitement to riot.

### b.    Vicarious Liability

Plaintiffs allege that Heimbach and Bamberger were acting as Trump's agents when the

incident occurred.[4]  (D.N. 1-1, PageID # 20)  The Trump Defendants maintain that they cannot

be held vicariously liable for Heimbach and Bamberger's actions.  (D.N. 9-1, PageID # 61-64)

With respect to this claim, the Court agrees that the complaint is deficient.

"Agency is the fiduciary relation which results from the manifestation of consent by one

person to another that the other shall act on his behalf and subject to his control, and consent by

the other to so act."  *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 50 (Ky. 2003) (quoting *CSX

Transp., Inc. v. First Nat'l Bank of Grayson*, 14 S.W.3d 563, 566 (Ky. Ct. App. 1999)).   No

employment relationship is necessary to establish agency.  *Brooks v. Grams, Inc.*, 289 S.W.3d

208, 211 (Ky. Ct. App. 2008).  Nor does it matter whether the purported agent "volunteered his

services."  *Id.* (citing *Fournier v. Churchill Downs-Latonia, Inc.*, 166 S.W.2d 38, 40 (Ky. 1942)).

Instead, under Kentucky law, "the most critical element in determining whether an agency

relationship exists" is the alleged principal's "right to control" the agent's conduct.  *Phelps*, 103

S.W.3d at 50 (quoting *CSX Transp.*, 14 S.W.3d at 566-67).  Plaintiffs fail to allege that Trump

had this right.

Count IV of the complaint asserts that the Trump Defendants "selectively targeted the

protesters for physical violence because of the content of their speech" (D.N. 1-1, PageID # 20

¶ 111); that Trump's "statements and comments during the Rally called for and sanctioned the

physical abuse of Plaintiffs" (*id.* ¶ 113); that his "inducement and encouragement of Heimbach,

---

[4] In the alternative, Plaintiffs seek apportionment of fault to the Trump Defendants.  (*See* D.N. 1-1, PageID # 20 ¶ 110)  The Court makes no finding as to apportionment at this time.

Bamberger, and/or Unknown Defendant to remove Plaintiffs from the Rally by way of physical force was a substantial factor in causing Plaintiffs' injuries" (*id.* ¶ 114); and that he "knew or should have known" that his statement would result in Plaintiffs being physically assaulted.  (*Id.* ¶ 112; *see also id.*, PageID # 20-21 ¶ 115)  Nowhere in Count IV or elsewhere in the complaint do Plaintiffs allege that Trump or the campaign had the right to control the other defendants' actions.  Although allegations that audience members acted at Trump's direction suggest that he exercised some level of control over Bamberger and Heimbach (*see, e.g., id.*, PageID # 15), it is not enough that "Trump told people to do something" and "[t]hey did it," as Plaintiffs assert.  (D.N. 16, PageID # 177)  Rather, a principal must have control over the manner in which the agent performs his duties.  *Nazar v. Branham*, 291 S.W.3d 599, 606-07 (Ky. 2009) ("An individual is the agent of another if the principal has the power or responsibility to control the method, manner, and details of the agent's work." (citing *City of Winchester v. King*, 266 S.W.2d 343, 345 (Ky. 1954))); *cf. Brooks*, 289 S.W.3d at 212 (store employee's spouse who caused car accident with plaintiffs while running errand for store was not store's agent where "[a]part from supplying the money," store did not "exercise[] any control over how [he] performed the task").  Plaintiffs' conclusory assertions that "Heimbach, Bamberger, and Unknown Defendant were acting as agents" of the Trump defendants (*id.*, PageID # 20 ¶ 108) and that the campaign is vicariously liable for the actions of Trump and his agents (*id.* ¶ 109) are insufficient without supporting factual allegations.  *See Churchill Downs, Inc. v. NLR Entm't, LLC*, No. 3:14-CV-166-H, 2014 U.S. Dist. LEXIS 71672, at *8-*9 (W.D. Ky. May 27, 2014).   Count IV will therefore be dismissed.

c.        **Negligence**

Finally, the Trump Defendants contend that they cannot be liable for negligence because they had no duty to Plaintiffs; the security provided was adequate; there is no alleged causal connection between Trump's words and Plaintiffs' injuries; and Plaintiffs assumed the risk of injury.  (D.N. 9-1, PageID # 64-68)  In their reply, they further assert that to find Trump's statement negligent—which they characterize as a "new negligence theory" raised for the first time in Plaintiffs' response—would violate the First Amendment.  (D.N. 23, PageID # 253) None of these contentions has merit.

As an initial matter, the Court rejects the Trump Defendants' baseless assertion that Plaintiffs announced a "new negligence claim" in their response by indicating that Trump "could be liable for speaking and negligently causing Plaintiffs harm."  (D.N. 23, PageID # 253)  Count V of the complaint alleges:

> 121.    Trump and the Trump campaign knew or should have known that by encouraging members of the audience, including Heimbach, Bamberger, and/or Unknown Defendant, to "get [Plaintiffs] out of here," these individuals would physically attack the Plaintiffs.

> 122.    In particular, the directive to eject a Black woman, when several members of a group that Trump knew or should have known was a recognized hate group were present in the audience, was entirely reckless, or at least negligent/grossly negligent.

(D.N. 1-1, PageID # 21-22)  The assertion that Plaintiffs failed to allege "any knowledge on the part of Defendants" that Trump's audience might be predisposed to violence is similarly misguided in light of Paragraph 122.  (D.N. 23, PageID # 255)

Nor is the Court persuaded by the Trump Defendants' contention that the First Amendment precludes liability for negligence here.  (*See id.*, PageID # 253)  The cases they cite involved defamation or other false statements.  (*See id.* (citing *United States v. Alvarez*, 132 S.

Ct. 2537 (2012); *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003);

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)))  The sole exception is *Rogers v. United

States*, 422 U.S. 35 (1975), in which the defendant was convicted of making threats against the

president and Justice Marshall cautioned in a concurrence that the Court "should be particularly

wary of adopting [a negligence] standard for a statute that regulates pure speech."  *Id.* at 47

(Marshall, J., concurring).  This is hardly a categorical rule.  The law is clear, however, that

"[s]peech that falls within th[e] category of incitement is not entitled to First Amendment

protection."  *James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) (considering

negligence claims against producers of violent video games and movies).  And as explained

above, Plaintiffs have adequately alleged that Trump's words amounted to incitement.  *See supra*

Part II.A.1.a.  Their negligence claim thus presents no First Amendment concerns at this stage of

the case.

The complaint also sufficiently alleges that the Trump Defendants had a duty to

Plaintiffs.  Though the Trump Defendants are correct that "a proprietor is not the insurer of the

safety of its guests," *Murphy v. Second St. Corp.*, 48 S.W.3d 571, 574 (Ky. Ct. App. 2001), this

does not absolve them from liability.[5]  "In Kentucky, 'the rule is that every person owes a duty to

---

[5] In a parenthetical, the Trump Defendants assert that they were not "proprietors."  (D.N. 9-1,
PageID # 65)  They offer no explanation or authority for this contention.  While the term
*proprietor* normally refers to "[a]n owner, esp[ecially] one who runs a business," *Black's Law
Dictionary* (10th ed. 2014), it also means "[a] person who . . . has a (usually exclusive) right or
title to [something's] use or disposal."  *Oxford English Dictionary* (3d ed. 2007); *see also Pirolo
v. City of Clearwater*, 711 F.2d 1006, 1010 (11th Cir. 1983) ("*Black's Law Dictionary* defines a
proprietor as: 'One who has the legal right or exclusive title to anything.  In many instances it is
synonymous with owner.'" (quoting *Black's Law Dictionary* 1098 (rev. 5th ed. 1979)))).  As the
Trump Defendants had the right to use the convention center on the day of the rally, they may
have borne the duty "to provide adequate security," as Plaintiffs allege.  (D.N. 1-1, PageID # 21
¶ 117; *see id.* ¶ 120 (alleging that Trump Defendants were negligent or reckless in "relying on
the crowd of Trump supporters to provide security"))  The Court need not resolve this issue at
the motion-to-dismiss stage.

every other person to exercise ordinary care in his activity to prevent *foreseeable* injury.'"

*Waldon v. Housing Auth. of Paducah*, 854 S.W.2d 777, 779 (Ky. Ct. App. 1991) (quoting

*Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328 (1987)).

To establish foreseeability in the proprietor–patron context, a plaintiff must show

> (1) that the proprietor had knowledge that one of his patrons was about to injure
> the plaintiff and he failed to exercise ordinary care to prevent such injury; or[]
> (2) that the conduct of some of the persons present was such as would lead a
> reasonably prudent person to believe that they might injure other guests.

*Murphy*, 48 S.W.3d at 574 (citing *Sidebottom v. Aubrey*, 101 S.W.2d 212, 213 (Ky. 1937)).

"Even an intervening criminal act does not relieve one f[rom] liability for his or her negligent

acts or omissions, where the criminal act is a reasonably foreseeable consequence of the

defendant's negligent act." *Waldon*, 854 S.W.2d at 779 (citing *Wheeler v. Andrew Jergens Co.*,

696 S.W.2d 326 (Ky. 1985)); *see also* Restatement (Second) of Torts § 302B (1965) ("An act or

an omission may be negligent if the actor realizes or should realize that it involves an

unreasonable risk of harm to another through the conduct of the other or a third person which is

intended to cause harm, even though such conduct is criminal.").

The cases cited by the Trump Defendants on this point are inapposite.  (*See* D.N. 9-1,

PageID # 65-66)  In *Grisham v. Wal-Mart Stores, Inc.*, 929 F. Supp. 1054 (E.D. Ky. 1996), the

plaintiffs sued Wal-Mart for negligence after they were robbed at gunpoint in the store's parking

lot and one plaintiff was shot in the hand and knee.  *Id.* at 1055-56.  The court concluded that a

single previous robbery within five miles of the store did not make the plaintiffs' robbery

foreseeable and that Wal-Mart thus did not have a duty to prevent it.[6]  *See id.* at 1058-59.

---

[6] Citing *Grisham*, the Trump Defendants assert: "Kentucky law is clear that 'neither a single incident nor sporadic incidents are sufficient to establish foreseeability.'"  (D.N. 9-1, PageID # 65 (quoting *Grisham*, 929 F. Supp. at 1058))  In fact, this purported rule is neither clear nor established in Kentucky.  The *Grisham* court's full statement was as follows: "Although no

Likewise, in *Napper v. Kenwood Drive-In Theatre Co.*, 310 S.W.2d 270 (Ky. 1958), it was not foreseeable that a group of boys would start a fist fight with the plaintiffs at a drive-in movie theater after "smarting off," "bothering girls," and "looking for boys with leather jackets." *Id.* at 271; *see id.* at 272.  As the *Napper* court noted, "what constitutes ordinary care or reasonable foreseeability varies with the particular circumstances." *Id.* at 271.  Neither *Grisham* nor *Napper* involved a defendant alleged to have triggered the criminal act of a third party, as is the case here.  *See* Restatement (Second) of Torts § 449 ("If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."); *see also Waldon*, 854 S.W.2d at 779 (noting that the Kentucky Supreme Court has adopted § 449).  Under these circumstances, the number of prior incidents is of little significance.

Plaintiffs allege that Heimbach and others with him were wearing t-shirts that identified them as supporters of the Traditionalist Worker Party (D.N. 1-1, PageID # 12-13); that Trump knew or should have known that his audience included members of "a recognized hate group"; and that ordering the removal of an African-American woman was thus particularly reckless. (*Id.*, PageID # 21-22 ¶ 122; *see id.*, PageID # 7)  They further allege that a protestor had been attacked at an earlier Trump rally.  (*Id.*, PageID # 16 ¶ 85)  In sum, the Court finds that Plaintiffs have adequately alleged that their harm was foreseeable and that the Trump Defendants had a duty to prevent it.

---

bright lines have been drawn regarding the number and frequency of criminal incidents that will give rise to a duty, case law from other jurisdictions indicates that neither a single incident nor sporadic incidents are sufficient to establish foreseeability." 929 F. Supp. at 1058 (citations omitted).  The court cited cases from Nebraska, Texas, and North Carolina.  *See id.*

The Trump Defendants also argue that Plaintiffs "fail to plausibly allege proximate cause." (D.N. 9-1, PageID # 67)  However, the complaint alleges that Plaintiffs' injuries were "a direct and proximate result" of the Trump Defendants' actions (D.N. 1-1, PageID # 22 ¶ 22), and it contains ample facts supporting this allegation.  (*See, e.g.*, *id.*, PageID # 12 ¶ 56 ("When Trump told the audience to "get 'em out of here,' Heimbach and his group rushed in and began physically assaulting the protestors."); *id.*, PageID # 15 ¶ 76 ("Trump kept saying 'get them out, get them out,' and people in the crowd began pushing and shoving the protestors . . . ." (quoting Bamberger letter to KWVA)))  The contention that Trump's "statement could not have been the proximate cause of any violence" because the statement was "likely not directed at the crowd" is without merit; as explained above, Plaintiffs plausibly allege that Trump intended for audience members to act on his words.  *See supra* Part II.A.1.a.i.  And the Trump Defendants cite no authority for their assertion that any causal link was "severed" by Trump's later statement "Don't hurt 'em."  (D.N. 9-1, PageID # 67)

The Court does not share the Trump Defendants' concern that the complaint lacks allegations as to the type or costs of security present or needed at the rally.  (*See* D.N. 9-1, PageID # 64, 66-67; D.N. 23, PageID # 254)  Plaintiffs' claim is that the Trump Defendants were negligent in relying on audience members to remove protestors rather than letting professional security personnel handle that task, not that security officers weren't present or sufficient in number.  (*See* D.N. 1-1, PageID # 21 ¶ 120)  This claim is further supported by Plaintiffs' allegation that no professionals intervened during the assault.  (*See id.*, PageID # 11 ¶ 47)

Finally, the Court rejects the Trump Defendants' contention that Plaintiffs assumed the risk of injury by choosing to protest at the rally.  (*See* D.N. 9-1, PageID # 68)  The doctrine of assumption of the risk was abolished in Kentucky decades ago.  *See Parker v. Redden*, 421

16

S.W.2d 586, 592 (Ky. 1967).  To the extent Plaintiffs bear any fault for their injuries, that issue

will be addressed through apportionment.  *See* Ky. Rev. Stat. § 411.182; *see also Carter v. Bullitt

Host, LLC*, 471 S.W.3d 288, 295 (Ky. 2015).

### 2.    Alvin Bamberger

Like the Trump Defendants, Bamberger seeks dismissal of all claims asserted against

him.  (D.N. 10)  Plaintiffs concede that neither Shah nor Brousseau alleges a cause of action

against Bamberger.  (D.N. 15, PageID # 126)  However, they maintain that Nwanguma's claims

of assault and battery are viable.  The Court agrees.

Bamberger's challenge to the assault and battery claims rests on Plaintiffs' purported

failure to allege that Nwanguma felt threatened by Bamberger or that she suffered any injury as a

result of Bamberger striking and shoving her.  (D.N. 10-1, PageID # 77)  These arguments are

meritless.  Bamberger is correct that "the threat of unwanted touching" is an essential element of

assault under Kentucky law.  *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001) (citing

*Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky. Ct. App. 1999)).  Plaintiffs allege this generally in Count

II of the complaint, asserting that "[b]y attacking Plaintiffs, Defendants Heimbach, Bamberger,

and Unknown Defendant[] intentionally, maliciously, wantonly and/or recklessly caused

Plaintiffs to experience apprehension and fright of an immediate harmful and/or offensive

contact."  (D.N. 1-1, PageID # 18-19)  More importantly, they provide facts to support this

allegation, stating that Bamberger and Heimbach were "[t]he most aggressive of those who

assaulted Nwanguma" (D.N. 1-1, PageID # 12); that Bamberger "aggressively mov[ed]

Nwanguma through the crowd by shoving her and striking her" (*id.*); and that "Bamberger

shoved Nwanguma, and continued to shove her repeatedly while she was exiting the Rally."

(*Id.*, PageID # 14)  Under the facts alleged, it is reasonable to infer that Bamberger caused

Nwanguma to fear an "unwanted touching." *Banks*, 39 S.W.3d at 480; *see Iqbal*, 556 U.S. at 678.

The Court is similarly unpersuaded by Bamberger's contention that Nwanguma has failed to allege any injury. Again, although the complaint alleges generally that "Plaintiffs suffered injuries" as a result of the assault and battery by Bamberger and Heimbach (D.N. 1-1, PageID # 18-19), it states that Plaintiffs seek "compensatory damages . . . against all Defendants for physical injuries, emotional distress, humiliation, and mental anguish" (*id.*, PageID # 22), and the allegations that Nwanguma was repeatedly shoved and struck by Bamberger support this demand. Even if Nwanguma were only entitled to nominal damages (as Bamberger maintains), her claim would not be barred for failure to allege such damages in the complaint. *See Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc.*, 554 F. App'x 176, 190 (4th Cir. 2014) ("Nominal damages need not be specifically pleaded where a party alleges a claim for general damages; the general damage allegation sufficiently encompasses nominal damages." (citing *Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 853 (4th Cir. 1992)).

Finally, Bamberger argues that Count VI of the complaint, which asserts a claim for punitive damages, must be dismissed because no cause of action for punitive damages exists. (D.N. 10-1, PageID # 76). Bamberger is correct that "a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action." *Dalton v. Animas Corp.*, 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012) (citation omitted). Thus, the Court will grant his motion as to Count VI. This dismissal will not preclude Plaintiffs from recovering punitive damages, however. *See Hume v. Quickaway Transp. Inc.*, No. 3:16-cv-00078-JHM, 2016 U.S. Dist. LEXIS 77831, at *37 (W.D. Ky. 2016) (dismissing punitive-damages claim to

extent it was asserted as separate cause of action but leaving award of punitive damages "for future determination").

### B.       Motion to Strike

Unlike his codefendants, Heimbach does not seek dismissal of any claims; instead, he moves to strike certain portions of the complaint.  (D.N. 11)  Pursuant to Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Although the rule permits motions to strike, *see id.*, such motions "are viewed with disfavor and are not frequently granted."  *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citations omitted).  The Sixth Circuit instructs that a pleading should be stricken "'only when required for the purposes of justice' and only when 'the pleading to be stricken has no possible relation to the controversy.'"  *Vanden Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 752 (W.D. Ky. 2014) (quoting *Brown & Williamson*, 201 F.2d at 822).  Thus, "motions to strike are 'typically denied unless the allegations at issue do not relate to the subject matter of the action and may cause significant prejudice to one or more of the parties.'"  *Id.* (quoting *New Day Farms, LLC v. Bd. of Trs. of York Twp.*, No. 2:08-cv-1107, 2009 U.S. Dist. LEXIS 130429, at *9 (S.D. Ohio June 10, 2009)).  The purpose of a motion to strike is to "'avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with' them early in the case."  *Operating Eng'rs*, 783 F.3d at 1050 (quoting *Kennedy v. City of Cleveland*, 797 F.2d 297, 305 (6th Cir. 1986)).  Heimbach's motion does not serve this purpose.

"An allegation is 'impertinent' or 'immaterial' when it is not relevant to the issues involved in the action.  'Scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from

19

the dignity of the court." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 801 (E.D. Mich. 2015) (internal quotation marks and citation omitted). Heimbach attacks thirteen segments of the complaint as being impertinent, immaterial, or scandalous. (D.N. 11) The first two, a quote from Ronald Reagan and an introductory paragraph asserting that Trump broke with American political tradition by "by inciting his supporters to physically attack protestors at his rallies and campaign appearances," are challenged by Heimbach as "rhetorical flourish." (*Id.*, PageID # 86 (quoting D.N. 1-1, PageID # 6)) While these parts of the complaint may not be essential, they are neither unrelated to the case nor prejudicial to Heimbach. *See Vanden Bosch*, 13 F. Supp. 3d at 752. Rule 12(f) is not a means for the Court to edit Plaintiffs' complaint, and the Court declines to do so. *Cf. Saylavee LLC v. Hockler*, 228 F.R.D. 425, 426 (D. Conn. 2005) ("Inappropriately hyperbolic allegations, ill-conceived attempts at levity, and other similar manifestations of bad judgment in drafting pleadings, by themselves, fall short of the threshold that Rule 12(f) contemplates.").

The Court also declines to strike the paragraphs discussing Heimbach's association with a white nationalist group and statements Heimbach has made about how Trump may further the interests of that group. (*See* D.N. 1-1 ¶¶ 4-8, 54, 67, 72) These paragraphs provide context for the alleged attacks on Nwanguma and the other plaintiffs by illustrating Heimbach's antipathy toward non-whites and persons who oppose Trump. *See, e.g.*, *Stanbury Law Firm, P.A. v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000) (reversing grant of motion to strike where stricken material "provide[d] important context and background to [the plaintiff's] suit"); *see also, e.g.*, *Jones v. Heritage-Crystal Clean, LLC*, No. 8:16-cv-623-T-33JSS, 2016 U.S. Dist. LEXIS 99490, at *7 (M.D. Fla. July 29, 2016) (declining to strike allegations that "provide[d] helpful context and background information"). For the same reason, the allegations support Plaintiffs' claim for

punitive damages.  *See* Ky. Rev. Stat. § 411.184(2) (providing for punitive damages where plaintiff can prove that defendant "acted toward the plaintiff with oppression, fraud or malice"); Wright & Miller, *Federal Practice & Procedure* § 1382 (3d ed. 2017) (courts need not strike allegations that may be relevant to punitive-damages claims).  They may also support Plaintiffs' negligence and incitement claims by suggesting that the Trump Defendants should have been aware that the audience included white nationalists.  *See supra* Parts II.A.1.a, c.  Because the allegations relate to Plaintiffs' claims, they will not be stricken.  *See Vanden Bosch*, 13 F. Supp. 3d at 752.

Nor does the Court find Paragraphs 40 and 41—which describe racial, ethnic, and sexist slurs Nwanguma allegedly heard at the rally—to be impertinent, immaterial, or scandalous, as Heimbach contends.  (D.N. 11, PageID # 91-92; *see* D.N. 1-1, PageID # 11)  While the words themselves are repulsive, they are relevant to show the atmosphere in which the alleged events occurred.  *See Stanbury Law Firm*, 221 F.3d at 1063.  Moreover, these allegations pose no prejudice to Heimbach, who is not mentioned in either paragraph.

Finally, Plaintiffs' allegation in Paragraph 83 that they filed police reports concerning the alleged attacks is related to the controversy and does not prejudice Heimbach in any way.  *See Vanden Bosch*, 13 F. Supp. 3d at 752.  It therefore will not be stricken.

### III.   CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     The motion to dismiss by Defendants Donald J. Trump and Donald J. Trump for President, Inc. (D.N. 9) is **GRANTED** as to Count IV of the complaint.  The Trump Defendants' motion is **DENIED** as to Counts III and V.

(2)     Defendant Alvin Bamberger's motion to dismiss (D.N. 10) is **GRANTED** with respect to Count VI of the complaint and any claims by Shah or Brousseau against Bamberger. Bamberger's motion is **DENIED** in all other respects.

(3)     Defendant Matthew Heimbach's motion to strike (D.N. 11) is **DENIED**.

(4)     Plaintiffs' motion for a hearing to address whether Defendant Trump should be deposed prior to his inauguration as President (D.N. 24) is **DENIED** as moot.

(5)     Pursuant to 28 U.S.C. § 636(b)(1)(A), this matter is **REFERRED** to Magistrate Judge H. Brent Brennenstuhl for resolution of all litigation planning issues, entry of scheduling orders, consideration of amendments thereto, and resolution of all nondispositive matters, including discovery issues.  Judge Brennenstuhl is further authorized to conduct one or more settlement conferences in this matter.

March 31, 2017

**David J. Hale, Judge**
**United States District Court**

22

Tab 2

CASE NO. **16CI01504**

JEFFERSON CIRCUIT COURT
DIVISION_____

KASHIYA NWANGUMA

and

MOLLY SHAH

JEFFERSON CIRCUIT COURT
DIVISION THREE (3)

and

HENRY BROUSSEAU

PLAINTIFFS

vs.

DONALD J. TRUMP
     SERVE:    Donald J. Trump
               c/o The Trump Organization
               725 Fifth Avenue
               New York, New York 10022

DONALD J. TRUMP FOR PRESIDENT, INC.
     SERVE:    CT Corporation System
               4701 Cox Road, Suite 285
               Glen Allen, Virginia 23060

MATTHEW JOHN HEIMBACH
a/k/a MATTHEW WARREN HEIMBACH
     SERVE:    Matthew Heimbach
               6045 Budmar Avenue
               Cincinnati, Ohio 45224-2409

ALVIN BAMBERGER
     SERVE:    Alvin R. Bamberger
               4491 Fork Road
               Cincinnati, Ohio 45247

A COPY
ATTEST: DAVID L. NICHOLSON, CLERK
JEFFERSON CIRCUIT COURT
LOUISVILLE, KENTUCKY

BY_____D.C.

and

UNKNOWN DEFENDANT

DEFENDANTS

## VERIFIED COMPLAINT

Plaintiffs, Kashiya Nwanguma, Molly Shah, and Henry Brousseau, for their Complaint against the Defendants, Matthew John Heimbach, Alvin Bamberger, Donald J. Trump for President, Inc., and Donald J. Trump, state the following:

## INTRODUCTION

*"Peace is not absence of conflict, it is the ability to handle conflict by peaceful means."*
--Ronald Reagan

Protesters from every side of the political spectrum have been a regular feature in American politics, and at American political rallies, since time immemorial. They regularly appear at public functions attended by the President of the United States, and in this campaign season, every candidate has seen his share of protesters. But one – Donald J. Trump – has decided to break with American tradition and the rule of law by inciting his supporters to physically attack protesters at his rallies and campaign appearances. Worse still, these attacks often carry with them the blatant stamp of racism, religious intolerance, misogyny, or any combination of the three. This is an action for incitement pursuant to Kentucky statutory law, and an action for common law assault, battery, negligence, gross negligence, and recklessness resulting from incidents facilitated, incited, encouraged, endorsed, and subsequently ratified by Defendant Trump at a campaign rally in Louisville, Kentucky, on March 1, 2016.

## JURISDICTION AND VENUE

1.     Jurisdiction is proper under Ky. Const. §112 because the causes of action set forth below arise under Kentucky statutes and common law, the injuries occurred in Kentucky, the total damages claimed exceed the jurisdictional threshold of the Circuit Court, and the Plaintiffs all reside in Kentucky.

2

2.      Venue is proper because the injuries occurred in Jefferson County and the Plaintiffs reside in Jefferson County.

**PARTIES**

**I.      MATTHEW HEIMBACH**

3.      Defendant Matthew John Heimbach, a/k/a Matthew Warren Heimbach, is a supporter of Defendant Donald J. Trump.

4.      Heimbach has been described by the Southern Poverty Law Center as "the face of a new generation of white nationalists."

5.      Heimbach is affiliated with the Traditionalist Worker Party, a recognized hate group and self-proclaimed political party which is ideologically opposed to, among other things, what it calls "miscegenation," i.e., different ethnicities living together in the same community and intermarrying. Heimbach himself has been quoted as saying, "It's separation or mongrelization."[1]

6.      Heimbach has even been banned outright from entering the United Kingdom, on the grounds that his presence may "foster hatred which might lead to inter-community violence in the UK."[2]

7.      Heimbach has been quoted as saying of Trump: "This is the first time since Buchanan in the '90s and George Wallace in '68 where you have a guy outside the mainstream speaking to white interests."

8.      Heimbach and the Traditionalist Worker Party have actively been engaged in recruiting supporters of Donald Trump. In fact, Heimbach has even stated, "We have the potential to be able to work with so many of these millions of families to be able to then move

---

[1] https://www.splcenter.org/fighting-hate/extremist-files/individual/matthew-heimbach
[2] https://www.splcenter.org/hatewatch/2015/11/04/white-nationalist-matthew-heimbach-banned-united-kingdom

them in our direction. Donald Trump is a gateway drug...we can then move them from civic nationalism and populism to nationalism for us-and these people are ready for our message."

9.    Heimbach is a Caucasian male and is approximately 25 years of age.

10.    Heimbach is a resident of Ohio.

## II.   ALVIN BAMBERGER

11.    Defendant Alvin Bamberger is a supporter of Donald J. Trump.

12.    Bamberger is a Caucasian male and is approximately 75 years of age.

13.    Bamberger is a resident of Ohio.

## III.   DONALD J. TRUMP

14.    Defendant Donald J. Trump was the former host of a popular reality television show from 2005-2015, a former part-owner of the Miss Universe pageant, an occasional featured guest of WWE's *Wrestlemania,* and is the current front-runner for the Republican nomination in the race for President of the United States of America. Trump has recently intimated that he may be planning to run for President of the United States on an independent ticket if he is not the Republican nominee.

15.    Trump is a resident of New York.

## IV.   DONALD J. TRUMP FOR PRESIDENT, INC.

16.    Defendant Donald J. Trump for President, Inc. (hereinafter, the "Trump Campaign"), is a corporation existing under the laws of Virginia.

17.    The Trump Campaign contracted with the Kentucky International Convention Center ("KICC"), which is a state agency owned and operated by the Kentucky State Fair Board, to conduct business at a public building in Kentucky, i.e., the campaign rally discussed below.

## V.    UNKNOWN DEFENDANT

18.    In addition to the above-named Defendants, there is an additional Defendant believed to be a Caucasian woman, who is responsible for punching Plaintiff Brousseau, as set forth in further detail below.

19.    Upon information and belief, this unidentified woman is affiliated with Defendant Heimbach and the Traditionalist Worker Party.

20.    Upon information and belief, this unidentified woman is a supporter of Donald J. Trump.

## VI.    KASHIYA NWANGUMA

21.    At all times relevant to this Complaint, Plaintiff Kashiya Nwanguma was a 21-year-old college student majoring in Public Health.

22.    Nwanguma is an African-American who was born and raised in the United States.

23.    Nwanguma resides in Jefferson County, Kentucky.

## VII.    MOLLY SHAH

24.    At all times relevant to this Complaint, Plaintiff Molly Shah was a 36-year-old Caucasian mother and activist.

25.    Shah is a former public-interest attorney and special-education teacher for the Jefferson County Public Schools.

26.    Shah resides in Jefferson County, Kentucky.

## VIII.    HENRY BROUSSEAU

27.    At all times relevant to the events described in this Complaint, Plaintiff Henry Brousseau was a 17-year-old Caucasian high school student.

28.    Brousseau resides in Jefferson County, Kentucky.

## FACTUAL BACKGROUND

### I.    THE RALLY

29.    On March 1, 2016, pursuant to an agreement between the Commonwealth of Kentucky and Defendant Donald J. Trump for President, Inc., a rally in support of Defendant Trump occurred in Louisville, Kentucky, at KICC (hereinafter "the Rally").

30.    At the Rally, as discussed in further detail below, individuals who attempted to peacefully protest Trump were forcibly removed by Trump's supporters, pursuant to Trump's directives.

31.    Tickets and/or entry to the event were not denied to people simply because they had political views which differed from Trump and/or his supporters.

32.    Instead of allowing his own security, the Secret Service, or KICC security to remove protesters, Trump stopped his half-hour speech five different times to point out protesters and, in most cases, to tell his crowd of supporters to "get 'em out of here."

33.    Plaintiffs were some of the individuals Trump directed the crowd to "get out of here."

34.    On or around the time the injuries occurred to the Plaintiffs, as described below, Trump also stated: "Don't hurt 'em. If I say 'go get em,' I get in trouble with the press, the most dishonest human beings in the world."

35.    Trump went on to state: "In the old days, which isn't so long ago, when we were less politically correct, that kinda stuff wouldn't have happened. Today we have to be so nice, so nice. We always have to be so nice." Then Trump went into a discussion about waterboarding, and how it is "absolutely fine."

6

## II.   KASHIYA NWANGUMA

36.    At the time of the rally, Plaintiff Kashiya Nwanguma was a 21-year-old student attending classes at the University of Louisville.

37.    Nwanguma attended the Rally with the intention of peacefully protesting Trump.

38.    Nwanguma traveled to the Rally alone. She was not with a group at the time of her assault, did not enter with a group, and took no part in the group protests.

39.    Nwanguma is not affiliated with the Black Lives Matter movement.

40.    Supporters of Defendant Trump called Nwanguma a "nigger" and a "cunt" during the Rally.

41.    Nwanguma heard a number of other racial and ethnic slurs used by Trump's supporters during the Rally.

42.    Nwanguma did not intentionally make physical contact with any attendee of the Rally.

43.    Nwanguma did not threaten, curse at, or use any form of offensive language toward any attendee of the Rally.

44.    Nwanguma held up a sign depicting Defendant Trump's face on the body of a pig.

45.    Trump ordered his supporters to "get [Nwanguma] out of here."

46.    Nwanguma was thereafter violently assaulted by numerous protesters (as discussed further below) until she was forced to leave the Rally. A video of this assault went viral soon thereafter, and is readily available to be viewed on the internet.

47.    At no point did a police officer come to Nwanguma's aid, nor did they assist in her removal. Trump's supporters, upon Trump's command, took it upon themselves to use physical force to remove her from the Rally.

48.    The most aggressive of those who assaulted Nwanguma were Defendants Heimbach and Bamberger.

49.    Heimbach, who is nearly twice Nwanguma's size, repeatedly shoved Nwanguma and shouted "leftist scum" at her.

50.    Eventually Heimbach returned to the crowd, and Bamberger began aggressively moving Nwanguma further through the crowd by shoving her and striking her.

## III.    MOLLY SHAH

51.    Plaintiff Molly Shah attended the Rally with the intention of peacefully protesting Trump.

52.    Shah did not intentionally make harmful physical contact with any attendee of the Rally.

53.    Shah, like Nwanguma, heard numerous ethnic and racial slurs used by Trump supporters at the Rally.

54.    Inside the Rally, Shah saw a group of 4-6 people standing wearing black t-shirts with the words "tradworker.org" on them, which is the website for the Traditionalist Worker Party. One of these people was Defendant Heimbach.

55.    Shah continued to observe this group over the course of three hours, and watched them talk to dozens of Trump supporters. At no time did she witness anyone involved in the Trump Campaign or KICC security approach them or question their presence.

56.    Shah's group began to peacefully protest. When Trump told the audience to "get 'em out of here," Heimbach and his group rushed in and began physically assaulting the protesters.

8

57.     Shah witnessed the Unknown Defendant who was with Heimbach's group punch Plaintiff Brousseau.

58.     Shah began to walk out and was shoved hard from behind by Defendant Heimbach.

59.     As Shah continued to the back of the convention center, she was shoved and pushed by multiple Trump supporters.

60.     As a result of the above-described incidents, Shah experienced pain and difficulty sleeping for several days after the Rally.

## IV.    HENRY BROUSSEAU

61.     Plaintiff Henry Brousseau attended the Rally with the intention of peacefully protesting Trump.

62.     Brousseau did not intentionally make harmful physical contact with any attendee of the Rally.

63.     Brousseau, who was a 17-year-old high-school student, began to peacefully protest. When Trump told the audience to "get 'em out of here," Heimbach and his group rushed in and began physically assaulting the protesters.

64.     The Unknown Defendant, who is believed to be one of the Traditionalist Worker Party "comrades," punched Brousseau in the stomach.

65.     Since that time, Brousseau has experienced anxiety and nightmares.

## V.    MATTHEW HEIMBACH

66.     Heimbach went to the Rally dressed in a Traditionalist Worker Party t-shirt and a red hat which said "Make America Great Again," a Trump campaign slogan.

9

67.     Upon information and belief, Heimbach went to the Rally with other Traditionalist Worker Party activists (which he calls "comrades") in hopes of recruiting more members from among Trump's supporters.

68.     As described above, Heimbach personally physically attacked Plaintiffs Nwanguma and Shah. Nwanguma's assault and battery was captured on video.

69.     Afterwards, Heimbach wrote and spoke extensively about the Rally, admitting to his role in the physical altercation and implying that Nwanguma had initiated it.

70.     In one blog post, Heimbach stated:

> Now there's some viral footage of several heated moments in Louisville. One features yours truly helping the crowd drive out one of the women who had been pushing, shoving, barking, and screaming at the attendees for the better part of an hour. I'll avoid any additional Trump events to ensure that I don't become a distraction, but the entire point of the BLM's tactics is to push people until they push back. It won't be me next time, but White Americans are getting fed up and they're learning that they must either push back or be pushed down.

71.     Despite the fact that multiple videos exist of the entire Rally, there is no videographic evidence of Nwanguma or any other Plaintiff "shoving, barking, and screaming" at attendees, because that simply did not happen.

72.     In an interview with "Radio Aryan," Heimbach stated he was refraining from attending further rallies "because I want Donald Trump to continue to destroy the established Republicans, make the Jews around the world quake in their boots, and make leftists angry."

## VI.   ALVIN BAMBERGER

73.     Defendant Alvin Bamberger shoved Nwanguma, and continued to shove her repeatedly while she was exiting the Rally.

74.     During the rally on March 1, 2016, Bamberger was wearing a uniform associated with the Korean War Veterans Association ("KWVA").

10

75.     Subsequently, after concerns were raised about Bamberger's behavior and affiliation with KWVA, Bamberger wrote a letter to the KWVA admitting his role in the assault and battery of Nwanguma.

76.     In the letter, Bamberger writes: "Trump kept saying 'get them out, get them out' and people in the crowd began pushing and shoving the protesters, . . . I physically pushed a young woman down the aisle toward the exit, an action I sincerely regret."

77.     Bamberger said he learned only afterwards that some of the Trump supporters "standing right next to [him] were members of a white supremacy group."

78.     Upon information and belief, the "white supremacy group" Bamberger refers to is the Traditionalist Worker Party, one of whom was Defendant Heimbach. Bamberger also calls them a "hate group."

79.     "Unfortunately my state of mind after being knocked down and hurt[ing] myself, and being caught between a group of white supremacists and Black Lives Matter protesters contributed to my behavior however, there is no excuse for my actions," Bamberger wrote.

## VII.    TRUMP'S DIRECTIVES

80.     As discussed above, and as admitted to by Defendant Bamberger in his letter, the actions taken against Plaintiffs by Defendants and other attendees of the Rally were pursuant to the explicit directives given by Defendant Trump.

81.     Specifically, Trump's repeated order to "get them out" was directed to his supporters, and could have no other reasonable meaning but to remove protesters, including the Plaintiffs, using unwanted, harmful physical force.

82.     Each time he said, "get them out," Trump intended for his supporters to use unwanted, harmful physical force to remove protesters, including the Plaintiffs; knew or

reasonable should have known that his supporters would act upon his orders; and watched as his supporters physically removed and accosted Plaintiffs at the Rally.

## VIII.   THE AFTERMATH

83.    All plaintiffs have filed reports with the Louisville Metro Police Department. As of the filing of this Complaint, the incident described above - much of which was captured on video and occurred in the presence of thousands of witnesses - has been under investigation for approximately a month with no arrests.

## IX    TRUMP'S INCITEMENT AND ENDORSEMENT OF VIOLENCE AT SIMILAR EVENTS

84.    The Rally referred to above is not the first or last incident of its kind.

85.    At a Trump rally held on November 21, 2015 in Birmingham, Alabama, a protester was attacked, i.e., "roughed up." Trump commented on this incident, stating that the protester "started screaming by himself" and "he should have been, maybe he should have been roughed up." Trump further stated that "it was absolutely disgusting what [the protester] was doing," i.e., protesting against Trump.

86.    On February 1, 2016 at a rally in Cedar Rapids, Iowa, Trump instructed those in the crowd to "knock the crap out of" anyone who was "getting ready to throw a tomato." Trump followed this instruction by saying, "Seriously. Okay? Just knock the hell…" Trump continued by ensuring the crowd that if and when they took heed of his instruction, he would cover their legal fees: "I promise you, I will pay for the legal fees. I promise. I promise."

87.    On February 22, 2016 at a rally in Las Vegas, Nevada, Trump responded to a protester by alluding to the fact that protesters had it too easy in present times. He expressed his desire for the way things once were: "I love the old days. You know what they used to do to guys like that when they were in a place like this? They'd be carried out on a stretcher, folks."

12

88.    Trump told his supporters that he would like "to punch [the protester] in the face."

89.    On March 4, 2016, at a rally in Warren, Michigan, Trump gave the instruction to remove the protester. In doing so, Trump added the disclaimer that those removing him should not hurt him. However, this disclaimer was overshadowed by Trump's immediately following statement: "If you do [hurt him], I'll defend you in court. Don't worry about it."

90.    On March 8, 2016, Breitbart reporter Michelle Fields was grabbed and thrown to the ground at a Trump press conference. Fields made allegations that she was grabbed by Trump's Campaign Manager. Subsequently, Fields filed a police report. Trump's response was that Fields "made the story up." Trump's Campaign Manager has since been arrested for assault.

91.    On March 9, 2016 at a rally in Fayetteville, North Carolina, Trump, again, spoke of the "good 'old days" when protesters were treated "very, very rough." Trump asserted that such treatment deterred the protesters from doing it "again so easily."

92.    On March 11, 2016 at a rally in St. Louis, Missouri, Trump claimed that "part of the problem and part of the reason it takes so long" to remove those protesting was people are too averse to hurting each other. Essentially, Trump advocated that more violence would help to cure the problem.

93.    On March 19, 2016, at a rally in Arizona, a protester was punched and kicked repeatedly after being pointed out and described as "disgusting" by Trump from the stage.

94.    On March 29, 2016 at a rally in Janesville, Wisconsin, a 15-year-old female protester was pepper sprayed in the face and sexually assaulted by two unidentified Trump supporters. As the protester left the rally Trump's supporters erupted with "Hell Yeah," name calling, e.g., "goddamn communist, nigger lover," cries of victory, and an echo of Trump's usual response to protesters: "get 'em out of here!"

95.     Despite this persistent, unmistakable pattern of violence and/or threats of violence at his rallies, neither Trump himself nor Donald J. Trump for President, Inc., have taken adequate measures to ensure that further assaults on protesters are eliminated or at least minimized, and in fact, Trump has continued to encourage the continuation and escalation of such violence in the same manner during the past few months.

## CAUSES OF ACTION

### COUNT I
### BATTERY

96.     The Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Verified Complaint.

97.     As detailed in above paragraphs, Defendants Heimbach, Bamberger, and Unknown Defendant, without privilege or provocation, intentionally, maliciously, wantonly and/or recklessly made numerous offensive and/or harmful contacts with the persons of the Plaintiffs.

98.     As a result of these harmful contacts, Plaintiffs suffered injuries in excess of the jurisdictional limits of this Court.

### COUNT II
### ASSAULT

99.     The Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Verified Complaint.

100.    By attacking Plaintiffs, Defendants Heimbach, Bamberger, and Unknown Defendant, intentionally, maliciously, wantonly and/or recklessly caused Plaintiffs to experience

14

apprehension and fright of an immediate harmful and/or offensive contact.

101.    As a result of this apprehension and fright, Plaintiffs suffered injuries in excess of the jurisdictional limits of this Court.

## COUNT III
## INCITEMENT

102.    The Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Verified Complaint.

103.    As set forth in the description of the events at the Rally above, Defendant Trump, acting individually and as an agent of the Trump Campaign, incited a riot as defined under the Kentucky penal code, KRS 525.040 and KRS 525.010.

104.    In directing his supporters to eject peaceful protesters using harmful physical force, Trump intended to create a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct created grave danger of damage or injury.

105.    As a result of Trump's violation of the aforementioned statutes, Plaintiffs were harmed and have the right to recover pursuant to KRS 446.070.

106.    Trump's speech, as set forth above, was calculated to incite violence against the Plaintiffs and others, and does not constitute speech protected by the First Amendment to the United States Constitution or any analogous provision in the Kentucky Constitution.

## COUNT IV
## AGENCY/VICARIOUS LIABILITY

107.    The Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Verified Complaint.

15

108.   At all times pertinent to the claims set forth above, Defendants Heimbach, Bamberger, and Unknown Defendant were acting as agents of Defendant Trump and/or the Trump Campaign.

109.   The Trump Campaign is liable under a theory of *respondeat superior* or is otherwise vicariously liable for both the actions of Donald Trump himself and Trump's agents at a Trump Campaign event such as the Rally in question.

110.   If the Trump Campaign and/or Trump himself is not jointly and severally liable for the actions of Heimbach and Bamberger, they should at least be apportioned fault for their actions as described above.

111.   Defendant Trump and the Trump Campaign made no effort to suppress other offensive speech - e.g., racial and ethnic slurs, speech promoting racial apartheid, and speech unequivocally courting members for recognized hate groups - but selectively targeted the protesters for physical violence because of the content of their speech.

112.   Trump knew or should have known based on the prior actions of his supporters at the above-described rallies that occurred prior to the Rally, that when he used the phrase "get'em out of here" it was reasonable foreseeable that his supporters would physically assault Plaintiffs while they were being removed.

113.   Trump's statements and comments during the Rally called for and sanctioned the physical abuse of Plaintiffs by Heimbach, Bamberger, and Unknown Defendant.

114.   Trump's inducement and encouragement of Heimbach, Bamberger, and/or Unknown Defendant to remove Plaintiffs from the Rally by way of physical force was a substantial factor in causing the Plaintiffs' injuries

115.   Trump knew or should have known that by encouraging members of the audience,

16

including Heimbach, Bamberger, and/or Unknown Defendant, to "get [Plaintiffs] out of here," these individuals would physically assault the Plaintiffs.

## COUNT V
### NEGLIGENCE, GROSS NEGLIGENCE, AND RECKLESSNESS

116.    The Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Verified Complaint.

117.    Defendants Trump and the Trump Campaign had a duty under Kentucky common law to provide adequate security in order to ensure the safety, protection, and well-being of Rally attendees and the general public in connection with the Rally.

118.    Defendants Trump and the Trump Campaign breached the duties identified above, through their negligent, grossly negligent, and/or reckless actions, as set forth in this Complaint.

119.    In addition, Defendants Trump and the Trump Campaign acted with the absence of even slight care, thus constituting gross negligence and/or recklessness under Kentucky common law.

120.    Trump and the Trump campaign knew or should have known that relying on the crowd of Trump supporters to provide security, including making them responsible for ejecting peaceful protesters from the crowd, was an inadequate and entirely reckless, or at least negligent/grossly negligent, way in which to provide security.

121.    Trump and the Trump Campaign knew or should have known that by encouraging members of the audience, including Heimbach, Bamberger, and/or Unknown Defendant, to "get [Plaintiffs] out of here," these individuals would physically attack the Plaintiffs.

122.    In particular, the directive to eject a Black woman, when several members of a group that Trump knew or should have known was a recognized hate group were present in the

audience, was entirely reckless, or at least negligent/grossly negligent.

123.    As a direct and proximate result of Defendants' breach of their duties, Plaintiff has suffered losses in excess of the jurisdictional limits of this Court.

## COUNT VI
## PUNITIVE DAMAGES

124.    The Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Verified Complaint.

125.    Defendants acted toward Plaintiff with oppression and/or malice, and with knowledge that serious harm would likely arise from their conduct, thus entitling Plaintiff to recover punitive damages.

## DEMAND FOR RELIEF

**WHEREAS**, Plaintiffs pray as follows:

A.    That the Court award compensatory damages to them as against all Defendants for physical injuries, emotional distress, humiliation, and mental anguish;

B.    That the Court award punitive damages as against all Defendants, in an amount that will deter such conduct by defendants in the future;

C.    For pre-judgment and post-judgment interest and recovery of their costs; and

E.    For any and all other relief to which they may be entitled.

18

Respectfully submitted,

DANIEL J. CANON, PSC
DAVID N. WARD
CLAY DANIEL WALTON & ADAMS, PLC
101 Meidinger Tower
462 South Fourth Street
Louisville, Kentucky 40202
(502) 561-2005
dan@justiceky.com
david@justiceky.com
*Counsel for Plaintiffs*

GREGORY A. BELZLEY
CAMILLE BATHURST
BELZLEY BATHURST ATTORNEYS
P.O. Box 278
Prospect, Kentucky 40059
(502) 228-5084
gbelzley@aol.com
*Counsel for Plaintiffs*

## VERIFICATION

I, Kashiya Nwanguma, state that I have read the foregoing, and the statements contained therein

are true to the best of my knowledge and belief.

Kashiya Nwanguma

Subscribed and sworn to before me by KASHIYA NWANGUMA on this _____ day of March,

2016, to be her free act and voluntary deed.

My commission expires: May 9, 2018 .

NOTARY PUBLIC, KY STATE AT LARGE

20

## VERIFICATION

I, Molly Shah, state that I have read the foregoing, and the statements contained therein are true to the best of my knowledge and belief.

Molly Shah

Subscribed and sworn to before me by MOLLY SHAH on this $\underline{31^{st}}$ day of March, 2016, to be her free act and voluntary deed.

My commission expires: $\underline{10-7-18}$ .

NOTARY PUBLIC, KY STATE AT LARGE

21

## VERIFICATION

I, Henry Brousseau, state that I have read the foregoing, and the statements contained therein are true to the best of my knowledge and belief.

_Henry Brousseau_

Henry Brousseau

Subscribed and sworn to before me by HENRY BROUSSEAU on this 31 day of March, 2016, to be his free act and voluntary deed.

My commission expires: May 9, 2018 .

_Angela Rew_

NOTARY PUBLIC, KY STATE AT LARGE

22

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2017, a true and correct copy of the foregoing petition was provided to the Honorable David J. Hale via Federal Express. I further certify that on July 20, 2017, a true and correct copy of the foregoing petition was served via e-mail and Federal Express upon the following counsel:

Gregory A. Belzley
Camille A. Bathurst
BELZLEYBATHURST, ATTORNEYS
P.O. Box 278
Prospect, KY 40059
(502) 292-2452
gbelzley@aol.com
camillebathurst@aol.com

Daniel J. Cannon, PSC
David N. Ward
CLAY DANIEL WALTON & ADAMS, PLC
101 Meidinger Tower
462 South Fourth Street
Louisville, KY 40202
(502) 561-2005
dan@justiceky.com
david@justiceky.com

Stephen Beville Pence
PENCE & WHETZELL, PLLC
9300 Shelbyville Road, Suite 1205
Louisville, KY 40222
(502) 736-6200
steve@pencelegal.com

Finally, I certify that on July 20, 2017, a true and correct copy of the foregoing petition was served via Federal Express upon the following pro se party:

Matthew John Heimbach
619 North Gospel Street Lot 3
Paoli, IN 47454

/s/ *Michael Carvin*
Michael Carvin

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 20, 2017

Mr. Michael Anthony Carvin
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Mr. Anthony John Dick
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Mr. Vivek Suri
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Re: Case No. 17-5830, *In re: Donald Trump, et al*
Originating Case No. : 3:16-cv-00247

Dear Counsel,

    The petition for writ of mandamus has been docketed as case number **17-5830** with the caption listed above.  If you have not already done so, you must mail a copy of the petition to the lower court judge and counsel for all the other parties.

    The filing fee for the petition is $500, which is payable to the Clerk, Sixth Circuit Court of Appeals.  If you wish to seek a waiver of the filing fee, a motion for pauper status with a completed financial affidavit is due by **August 3, 2017**.  The financial affidavit is available at www.ca6.uscourts.gov.

    The district court judge to whom this petition refers has been served with this letter.

Sincerely yours,

s/Robin Baker
Case Manager
Direct Dial No. 513-564-7027

cc:  Ms. Vanessa L. Armstrong